IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-20619

_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellant,

versus

FRANCISCO ROBERTO MARTINEZ;
MICHAEL HAMAKER; WILLIAM GLENN
MITCHELL,

                              Defendants-Appellees.


_____

Appeal from the United States District Court for the
Southern District of Texas
_____

June 28, 1996

BEFORE GARWOOD, DAVIS and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

     Defendants-appellees (defendants) were indicted—together with numerous other individuals—for various narcotics and racketeering offenses.  The district court entered a pretrial order excluding the testimony of an important government witness on the basis that the government refused to comply with a court order to produce specified material under the Jencks Act, 18 U.S.C. § 3500.  The government appeals this order excluding testimony, and the district court stayed the defendants' trials pending resolution of the

appeal.

## Facts and Proceedings Below

On May 30, 1990, the instant 91-count indictment was returned against 31 defendants alleging various narcotics and racketeering offenses. The period covered by the indictment spanned from 1973 to the date of the indictment. Since the indictment was returned, most of the defendants have pleaded guilty.

On December 1, 1994, defendant Mitchell filed a motion requesting that the government turn over all Jencks Act material thirty days prior to trial because of the complex nature of the case. On March 15, 1995, a pretrial hearing was held on Mitchell's motion for early disclosure of Jencks Act material. The government, represented by Assistant United States Attorney (AUSA) Lewis (Lewis), stated that it would turn over the appropriate Jencks Act material ten days prior to trial, but asserted its position that the Jencks Act did not require the disclosure of the debriefing reports of government witnesses as the particular reports in question did not constitute the witnesses' "statements" under the Jencks Act. The district court disagreed and ordered such debriefing reports produced:

> "We've been through that. If the agent's report says the witness said, or Charlie told me, or the CI disclosed, or any of those things, that is the witness's statements. And the government argues that, well, it's not signed or adopted by the witness. It is relied on by the government, either you produce those reports or you go take his statement, have him sign it, and give it to Mr. Mitchell, one or the other."

The government filed a motion to reconsider and vacate, objecting to the court's order in that it required the government

to turn over agents' reports that were not covered by the Jencks Act.

The court held a hearing on the government's motion on July 19, 1995. AUSA Lewis advised the court that the Jencks Act issue had been narrowed to the debriefing report completed by Texas Department of Public Safety Lieutenant Enrique Espinoza (Espinoza) of government witness Aurelio Aleman (Aleman).[1] Lewis also represented to the court that striking Aleman's testimony could result in a not guilty verdict since Aleman's testimony was important to the government's case.

The court observed that "What I think is wrong is when the officers prepare materials that would be covered by Jencks Act in a different form for the very purpose of not having to disclose it." AUSA Lewis responded that that was not "the way debriefings occur," and that in a case such as this involving criminal activity over a long period

> "The debriefings as such go on for hours and sometimes days and can cover two or three weeks or months of time sporadically just trying to piece together what the witness has to say. The agents make rough notes, blurbs, phrases, catches of a sentence . . . . Later then, many of the debriefing reports say the witness was spoken to on such-and-such, then the report will show it was prepared days, weeks, or months later and then signed even later. So, by the time you get a final typed report, it's not anything like a transcript of what's going on here today."

---

[1]     The debriefing report concerning government witness James Curtis had been turned over to the defense, and was therefore not at issue. Additionally, Lewis focused on the Jencks Act issue as it applied to defendant Mitchell's trial, since the other named defendants were considering possible motions for severance of their respective trials, as well as the possibility of entering guilty pleas.

The court then expressed the view that "the larger problem is that the United States is preparing its cases relying on witnesses, not taking statements from them . . . you want to use the debriefing report the very way you would use a Jencks Act; that is, to impeach him." AUSA Lewis replied: "Not quite. I want to use the agent to whom the witness made the statement." Lewis went on to indicate that the report might be used to refresh recollection. The court then expressed the view that:

> "If his representations to the Government about what happened are incorporated into a document other than a witness statement and the Government has relied on them just as they would have a witness statement, then I think it's covered by Jencks Act because they would simply not take statements and rely on these other reports and use those as they would a witness statement."

The court determined that it would review Espinoza's report of the debriefing of Aleman to determine whether the report constituted Jencks Act material. Accordingly, the government submitted Espinoza's twelve-page, typed report of Aleman's debriefing to the court under seal for *in camera* review.[2]

On July 21, 1995, the government filed a pleading, to which was attached an affidavit from Espinoza—describing the basis and nature of his debriefing report, and representing that Aleman never saw nor heard this report—and a list of documents that had already been turned over under the Jencks Act pursuant to the government's agreement to provide such materials ten days prior to trial.

---

[2] A short, general overview of this report is included in the government's brief, which was placed under seal; defendants received a version of the government's brief in which this overview of Espinoza's report had been redacted. We will return to the content of this report.

4

Espinoza's affidavit states that he interviewed Aleman "over a period of several days in November and December 1990"—his report reflects the interviews took place November 30, December 1, and December 3, 1990—and "[i]n January of 1991, I began preparing the 12 page typed report, which I signed in March of 1991"; the "report was compiled from my rough notes of the interview and my memory of the information provided by Aleman," was prepared "using my own words" and "was not made contemporaneously with the interview"; and "I did not ever read the 12 page report back to Aleman, nor did I let him read it, nor did I let him review my rough notes, nor did I read them back to him."

On July 28, 1995, the court issued the challenged order in which it concluded that Espinoza's report constituted Aleman's "statement" under the Jencks Act. In arriving at this decision, the court acknowledged that Espinoza had "recorded [Aleman's] statements in rough notes" and wrote the report "from his notes of interviews of [] Aleman". However, the court also noted that the interviews were conducted in "late 1990," and that the report was dated January 2, 1991. The court also seemed to place great emphasis on the fact that paragraphs two through fifty-four of the report constituted "Espinoza's recording[s]" of Aleman's statements, and that thirty-eight of fifty-three paragraphs began with the phrase, "Aleman stated . . ." The court concluded that Aleman's statements were "simply recorded" in the sequence Aleman gave them, and that the report did not include any reflections, conclusions, theories, or impressions attributable to Espinoza.

5

The court also observed that Aleman "was interviewed by at least two agents at all times"[3] and wondered "how does it happen that . . . the one who 'reports' the interview is the one the government chooses not to call." The court ordered that Aleman would not be allowed to testify at trial because the government had refused to follow the court's order and comply with the Jencks Act by delivering a copy of Espinoza's report to the defense.

The government now appeals the district court's order.

### Discussion

This Court reviews for clear error a district court's finding that an agent's interview report is a witness "statement" within the meaning of the Jencks Act. *See United States v. Judon*, 581 F.2d 553, 554 (5th Cir. 1978). "The trial court's finding will constitute clear error where such finding either rests upon an incorrect rule of law or is inconsistent with the facts upon which it purports to rest." *United States v. Welch*, 810 F.2d 485, 490 (5th Cir.), *cert. denied,* 108 S.Ct. 350 (1987).

In criminal cases prosecuted by the United States:

> "After a witness called by the United States has testified on direct examination,[4] the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which

---

[3]    That two agents were present on each of the three interview days appears from the report itself; the record discloses no other source for this statement.

[4]    As Lewis agreed to turn over materials covered by the Jencks Act ten days prior to trial, the government does not challenge on appeal that portion of the court's order requiring that Jencks materials be provided to the defense earlier than required under the Act.

6

relates to the subject matter as to which the witness has testified . . ."  18 U.S.C. § 3500(b).

A "statement" is defined under the Jencks Act, 18 U.S.C. § 3500(e), as:

> "(1) A written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a *substantially verbatim recital* of an oral statement made by said witness and recorded *contemporaneously* with the making of such oral statement; or
>
> (3) a statement however taken or recorded or a transcription thereof, if any, made by said witness to a grand jury."  (Emphasis added).

Neither the district court nor any of the defendants has taken the position that the report falls within either (1) or (3) above, and it obviously does not.  That leaves only (2) above.

After examining *in camera* Espinoza's debriefing report (the report), the district court held that "the document's nature as purely the statement of the witness [Aleman] is obvious."  In its description of the report, the district court observed the following:

> "The document was prepared by agent Espinoza from his notes of interviews of Aurelia Aleman . . . Espinoza recorded the witness's statements in rough notes (as they are called in the police trade).  After he transmuted his notes into the report, he destroyed the notes. Parenthetically, the notes might have been a statement themselves, which means that they should not have been destroyed.  The interviews were held on three days in late 1990, and the document is dated January 2, 1991.
>
> . . .Paragraphs two through 54 are Espinoza's recording of Aleman's statements to him.  Of 53 paragraphs, 38 begin 'Aleman stated . . .'  Nine others begin saying that Aleman 'described,' 'advised,' or 'recalls.'  Five paragraphs start by saying Aleman 'met,' 'delivered,' 'arrived,' or similar things.  When a paragraph has more

7

than one sentence, the other sentences begin in the same fashion.

No part of the document records an agents [sic] analysis, synthesis, interpretation, coordination, evaluation, or even reorganization. Nothing in the document is agent derived. Aleman's statements are simply recorded in the sequence he said them. On the third day, Aleman amended an earlier statement in the interviews. The agent simply recorded the amendment at the point in the sequence that Aleman spoke. There was no arrangement by the agent, like inserting the new material back with the old.

No part of the report includes the agent's reflection on the information he had received from the witness. He drew no conclusion, revealed no theory, recorded no impression. The agent was a surrogate stenographer."

In determining that Espinoza's debriefing report constituted a "statement" under 18 U.S.C. § 3500(e)(2), the district court implicitly concluded that the report was both (1) a "substantially verbatim recital" of the narrative given by Aleman during the several days of debriefing, and (2) "recorded contemporaneously with the making of such oral statement." Beginning with the requirement of contemporaneity, the report reflects that the debriefing episodes took place on November 30, 1990, December 1, 1990, and December 3, 1990. Espinoza did not begin to prepare the report until January 1991. In light of this four-week interval between Aleman's debriefing and Espinoza's beginning to prepare the report, we hold that the district court clearly erred in (implicitly) finding that the report was "recorded contemporaneously with" Aleman's debriefing.

Turning to the requirement of section 3500(e)(2) that Espinoza's report must constitute a "substantially verbatim

8

recital" of Aleman's "oral statements" made at the debriefing, we find no support for the district court's conclusion that this requirement was satisfied in the instant case. We note that the word "verbatim" has been defined as follows: (1) "[R]eproduced from or repeating an original source word for word: following the original exactly", *Webster's Third New International Dictionary* 2542 (1981); (2) "in exactly the same words' word for word", *Random House College Dictionary* 1461 (revised ed. 1982). Of course, to be a section 3500(e)(2) statement, it is not required that the recital be perfectly or exactly "verbatim," but it must be "substantially verbatim." Further, the *ejusdem generis* maxim restrains any broad interpretation of "other recording" as used in section 3500(e)(2) and correspondingly counsels against a loose or expansive reading of "substantially verbatim," as does also the section's "recorded contemporaneously" requirement.

In *United States v. Judon*, 581 F.2d 553 (5th Cir. 1978), this Court addressed the meaning of the word "statement" as employed in the Jencks Act. We noted that, "[I]nterview reports which contain the interpretations or impressions of agents *or* 'which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent'" did not constitute "statements" within the meaning of the Act. *Id.* at 555 (citations omitted; emphasis added). This Court further observed that "statements" must be "*essentially transcriptions* of [] interview notes." *Id.* (emphasis added).

In *Judon*, an FBI agent interviewed a witness concerning the

9

details of a bank robbery and took notes during this interview. The agent testified that he did not attempt to write down the witness's statements verbatim, and further testified that he wrote "principally key words and phrases and things of this nature relating to the narrative" given by the witness. *Id.* at 554. Approximately one week later, the agent prepared a report based on "[his] notes and [his] memory and recall." *Id.* A second agent involved in *Judon* also interviewed another witness concerning the bank robbery. This agent made notes of the "highlights of that interview and more of a succinct summary or more or less the gist of the interview." *Id.* (citation omitted). Two days later, this second agent prepared a report based on "the notes and his recollection of the interview." *Id.* Based on the foregoing, the trial court in *Judon* concluded that "the agents did more than simply translate their interview notes into typewritten form." *Id.* at 555.[5]

---

[5] It appears that the agents' interview notes in *Judon* were destroyed before the trial court had an opportunity to order their production under the Jencks Act. *See* 581 F.2d at 555 n.1. It is unclear, however, whether or not the district court was able to examine these interview notes prior to their destruction. This Court observed in *United States v. Judon*, 567 F.2d 1289, 1291 (5th Cir. 1978), that the agents' *reports* were reviewed by the district court *in camera* and subsequently sent to this Court under seal in conjunction with Judon's appeal. There is no mention, however, of the district court's conducting a similar examination of the agents' interview notes. Nevertheless, this Court recognized that the agents' reports in *Judon* were "not essentially transcriptions of the interview notes." 581 F.2d at 555 n.1. Therefore, this Court upheld the district court's conclusion that the agents' reports were not transcriptions of the interview notes, not based on a comparison of the interview notes and the reports, but based instead on the agents' testimony concerning their reports and an examination of the reports themselves.

Finally, in light of our conclusion in *Judon* that the reports

In finding this conclusion by the trial court in *Judon* to be reasonable, this Court relied on the following "facts presented": (1) the notes taken by one of the agents constituted a "one handwritten page summary of the highlights of his interview"; (2) the other agent's notes contained "key words and phrases" from his interview and likewise comprised one handwritten page; (3) the reports subsequently prepared by both agents were "far more detailed than the notes"—one agent's report was one and one-half (single-spaced and typed) pages long, and the other agent's totaled three (single-spaced, typed) pages; and (4) both reports contained the witness's account in narrative form.   581 F.2d at 555. Additionally, this Court noted that both agents had testified that they used their interview notes to "jog their memory" and "on this basis prepared the [reports at issue]." *Id.*  Finally, one of the agents testified that, at the time he was preparing his report, his memory was incomplete.  *Id.*

In the present case, the posture of this appeal dictates that an affidavit must serve to illuminate the circumstances surrounding Espinoza's preparation of the debriefing report in question. Espinoza's July 21, 1995, affidavit was furnished to the district

_____

were not "essentially transcriptions of the interview notes," we observed that it was "unnecessary to determine whether the interview notes which were destroyed constitute[d] (e)(2) statements."  *Id.* In the present case, the district court's order states in passing that Espinoza "destroyed" his "notes" after he wrote his report.  We can find no support in the record for this statement, and the government informed us at oral argument that it had copies of the notes.  However, we need not pursue this further, as in the court below no issue was made concerning the notes, and none of the parties has raised any such issue on appeal.

court.  In this affidavit, Espinoza asserted that he "*began preparing*" his twelve page debriefing report in January of 1991 (emphasis added). Next, Espinoza stated that his report "was compiled from [his] rough notes of the interview and [his] memory of the information provided by Aleman."  Espinoza also asserted that, from Aleman's narrative accounts—which "jump[ed] from subject to subject in the same flow of conversation"—Espinoza "re-assembled the pieces, relying on [his] notes, and [his] memory and using [his] own words."  Espinoza further stated that, "I frequently used the words 'Aleman stated . . .' as a way of indicating the source of the information provided.  The use of such words does not mean or imply that what follows was a direct quote or a substantially verbatim account of what was said."  And, Espinoza explained that, in the instances where he quoted Aleman directly, he indicated this by using quotation marks.[6]  Finally, Espinoza averred that, "While my report is an accurate summary of the information provided, it is not a verbatim account, or even close to one."[7]

---

[6]  The report contains only about ten words—appearing in some seven different sentences—in quotation marks, five of these are informal first names of people and two are quantity statements.

[7]  This affidavit, together with Espinoza's report, constituted the only evidence before the district court bearing on the issue of whether or not Espinoza's report was a "substantially verbatim recital" of Aleman's "oral statement[s]" during the debriefing.  As this Court noted in *United States v. Edwards*, 702 F.2d 529, 531 (5th Cir. 1983), "The duty is on the defense to initiate the proper inquiry into the right to claim production of a statement under the Jencks Act."  *See United States v. Thomas*, 12 F.3d 1350, 1364 (5th Cir.), *cert. denied*, 114 S.Ct. 1861 (1994)("there is no evidence that any portion of the notes was a substantially verbatim transcription of the witness's statements.  Thus, the notes are not discoverable under the Jencks Act . . . .")*; see also United States v. Newton*, 891 F.2d 944, 954 (1st Cir. 1989)(the intent of the

With regard to the propriety of considering Espinoza's affidavit in resolving this inquiry under the Jencks Act, we have recognized that "the [district] court may need to hear extrinsic testimony to determine whether the notes are verbatim statements." *United States v. Hogan*, 763 F.2d 697, 704 (5th Cir.), *unrelated portion of opinion withdrawn in United States v. Hogan*, 771 F.2d 82 (5th Cir. 1985).  In *Judon*, this Court considered the testimony of both agents in determining that the agents' reports were not "substantially verbatim" transcriptions.  581 F.2d at 555; *see also Campbell v. United States*, 81 S.Ct. 421, 427 (1961)( "[The Jencks Act] implies the duty in the trial judge affirmatively to administer the statute in such a way *as can best secure relevant and available evidence necessary* to decide the directly opposed interests protected by the statute—the interest of the Government in safeguarding government papers from disclosure, and the interest of the accused in having the Government produce 'statements' which the statute requires to be produced") (emphasis added).[8]

The district court concluded that Espinoza's report constituted a "substantially verbatim recital" of Aleman's

Jencks Act is to require production of "'the witness' own words . . . fully and without distortion'"; therefore, where "there was no testimony that the agent was recording the exact words of the witness", production of such agent's notes under the Jencks Act was properly denied).

[8]    In *Campbell*, the Supreme Court noted that where the agent who authored the "interview report" at the center of a Jencks Act inquiry was available to testify regarding whether "[the report] was a contemporaneously recorded substantially verbatim recital of [a witness'] oral statement", then "[t]he circumstances of this case clearly required that the judge call [this agent] of his own motion or require the Government to produce him."  *Id*. at 426-427.

13

debriefing testimony based solely on its examination of the report and Espinoza's affidavit.  After reviewing this report and affidavit, we find no support for the district court's conclusion. We turn first to the district court's observation that, "Of 53 paragraphs [constituting the report], 38 begin 'Aleman stated . . .'  Nine others begin saying that Aleman 'described,' 'advised,' or 'recalls.'"  The district court viewed this as evidence that what followed in each instance was a verbatim transcription of Aleman's statements to Espinoza.  It is equally plausible that Espinoza intended only to clarify the source of this information.  The value of such clarification is demonstrated by the ambiguity surrounding a statement in paragraph eight of the report which is prefaced, "It is believed . . .."; it is uncertain in this instance whether Espinoza's information came from Aleman or from another source.

Moreover, the concise, carefully-drafted paragraphs in this report—stripped to only the most directly relevant information—convey such an abundance of detailed information (names, dates, locations, amounts, distances, etc. . .) that it is difficult to conceive of anyone orally communicating in such a manner. Additionally, the structure of several of these paragraphs, while visually accommodating, undercuts the argument that Espinoza was transcribing Aleman's narrative in a "substantially verbatim" manner.[9]

---

[9]   For example, paragraph thirty-eight, redacted in recognition that the report is under seal, reads as follows:

> "38) ALEMAN stated that ALEMAN transported to the [specified location for a particular person] the

14

Also, it is evident that the discreet capsules of information that are segregated paragraph-by-paragraph in Espinoza's report have been stripped of the conversational context which almost inevitably accompanies the movement in speech from one thought, incident, or topic to another.  It is not until paragraph twenty-one of the report that Aleman is credited with the correction of a mistake in his testimony.  In paragraph twenty-one, Espinoza documents that Aleman overlooked a load of marihuana in his preceding narrative: "On the second day of his (ALEMAN'S) debriefing, ALEMAN remembered a load of marihuana that he (ALEMAN) transported for [a specified person] that ALEMAN had forgotten about."  If the first twenty paragraphs of Espinoza's report are to be viewed as a "substantially verbatim recital," then we are asked to believe that Aleman spouted twenty discreet "capsules" of information without misstatement, uncertainty, or revision until he remembered, on the second day, that he had overlooked one load of marihuana in his narrative to that point.[10]

following loads of marihuana:

1.    [date]-- approximately [specified amount] (load #[])

2.    [date]-- approximately [specified amount] (load #[])

3.    [date]-- approximately [specified amount] (load #[])

4.    [date]-- approximately [specified amount] (load #[])

5.    [date](after Thanksgiving) -- approximately
         [specified amount] )load #[])"

[10]     Even if we make the entirely farfetched assumption that Espinoza did not filter the information provided by Aleman in order

15

Finally, the language used in the report suggests that Espinoza opted to put the information he obtained from Aleman into his own—Espinoza's—words. For example, in paragraph ten, the report states that "ALEMAN remembers that a [particular object was located] in the *curtilage* of this house." One might reasonably suspect that Aleman did not use the term "curtilage," as that term would likely be foreign to someone lacking a legal or law enforcement background. There is no indication that Aleman had such a background. Moreover, the entire report is couched in terminology that is usually reserved to legal documents (particularly in a criminal law context) or at least to someone accustomed to communicating in such terms. Paragraph fifteen begins, "ALEMAN stated that approximately in [specified dates], ALEMAN transported approximately one load of marijuana per month of approximately [amount] pounds each (loads #x, #y and #z) for [a particular person] . . . ." Lastly, paragraph twenty-seven

---

to present the litany of discreet and concise paragraphs that comprise his report, it is wholly unrealistic to pretend that Espinoza did not omit the contextual "glue" (transitions between topics and incidents, etc . . .) that is conspicuously absent from this report. Even if we make the unlikely assumption that Espinoza's editing was limited to culling out this "glue," even such editing must call into question the district court's observation that, "No part of the document records an agents [sic] analysis, synthesis, interpretation, coordination, evaluation, or even reorganization. Nothing in the document is agent derived." Any editing on the agent's part must raise as a serious issue in this (Jencks Act) context the applicability of the tenet that statements that contain an agent's interpretations or impressions are not producible. *See Goldberg v. United States*, 96 S.Ct. 1338, 1349 n.2 (1976); *United States v. Judon*, 581 F.2d 553, 554-555 (5th Cir. 1978)(unfair to require production of statements that could be said to be the product of the investigator's "selections, interpretations, and interpolations")(citations omitted).

16

provides a strong indication that Espinoza was using his own words—and incorporating his own impressions—in the report: "Aleman *described a typical unloading* at the . . . ." (Emphasis added). Therefore, we hold that the district court clearly erred in its determination that the language of Espinoza's report supported a finding that this report constituted a "substantially verbatim recital" of Aleman's oral statements during debriefing. Moreover, there is nothing in the report—or elsewhere in the record—which tends to contradict or cast doubt upon Espinoza's affidavit, and that affidavit likewise shows that the report was not a Jencks Act statement.

On a related topic, we observe that the district court demonstrated in various pretrial discussions that it viewed the government's *reliance* on the disputed (Jencks Act) materials as an additional ground for ordering disclosure of such materials under the Act. We find no support for this approach to 18 U.S.C. § 3500. Of course, such reports are presumably written to be relied on by law enforcement authorities for some purpose, but there is nothing to indicate that this report was written to be relied on *as* a "substantially verbatim" recital of Aleman's oral statements (or as a document to be "adopted or approved" by Aleman) or that the government ever so relied (or intended to rely) on it (indeed, there is nothing to indicate any particular reliance at all by the government on the report).

Lastly, it must be noted that our present decision in no way impinges upon any of the rights or protections established in *Brady*

*v. Maryland,* 83 S.Ct. 1194 (1963), and its progeny or under the general federal rules of evidence as applied in federal criminal cases. The Supreme Court's decision in *Brady*, rendered subsequent to its decision in *Jencks v. United States*, 77 S.Ct. 1007 (1957), recognized the government's general obligation to provide evidence that is both material and favorable to an accused. 83 S.Ct. at 1196-97. This includes evidence that would materially impeach a prosecution witness. *See United States v. Bagley*, 105 S.Ct. 3375, 3380 (1985). Our present decision in no way touches on this constitutional requirement. Had Espinoza's report contained material information favorable to any of the defendants, then such information would have to have been examined within the analytical framework established pursuant to *Brady* and its progeny *regardless* of whether or not this potentially exculpatory information constituted a "substantially verbatim" statement under 18 U.S.C. § 3500(e)(2).[11]

In *Jencks*, exercising its supervisory power "to prescribe procedures for the administration of justice in the federal courts," the Supreme Court "decided that the defense in a federal criminal prosecution was entitled, under certain circumstances, to obtain, for impeachment purposes, statements which had been made to

---

[11]    Mitchell filed a motion for production of exculpatory evidence on December 1, 1994; the government agreed to provide such evidence, and the district court granted the motion on March 15, 1995, at a pretrial motions hearing. However, while the parties agreed that a certain letter (written by Raymond Martinez) contained a potentially exculpatory statement and would therefore need to be produced, Espinoza's report was never specifically mentioned in this context. So far as we can determine, nothing in Espinoza's report could be construed as implicating *Brady.*

18

government agents by government witnesses." *Palermo v. United States*, 79 S.Ct. 1217, 1221 (1959). Promptly following the issuance of *Jencks*, Congress initiated and enacted the Jencks Act.

> "One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of Jencks would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness . . . it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." *Id.* at 1223.

Therefore, the Supreme Court emphasized in *Palermo* the statutory requirement that "statements" under 18 U.S.C. § 3500(e)(2) must constitute "a substantially verbatim recital of an oral statement made by said witness to an agent . . . ." *Id.* at 1224.

> "It is clear from the continuous congressional emphasis on "substantially verbatim recital' . . . that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital." *Id.* at 1224-25.

And, finally, in emphasizing this point, the Court observed that "The statute governs the production of documents; it does not purport to affect or modify the rules of evidence regarding admissibility and use of statements once produced." *Id.* at 1225-26. Our ruling today comports with *Palermo.* Further, we do not, for example, address the circumstances under which opposing counsel must be allowed to examine material that a witness for the other side admits in his testimony he has used to refresh his

recollection respecting the subject matter of his testimony.[12]

We reverse the district court's order excluding the testimony of Aleman and remand with instructions that the order be vacated.

REVERSED and REMANDED

---

[12] As far as concerns introduction in evidence of the report itself, this generally could only be done to impeach testimony of Espinoza himself, not Aleman. If Espinoza were to testify in a manner harmful to the defense and materially contrary to what he personally represents in the report—or if Aleman were to testify in a manner harmful to the defense but materially contrary to the substance of what the report asserts is the story he told at the debriefing—then the report or the said information in that part of it could well be required to be furnished to the defense as *Bagley* material.