Valentino T. COLASANTO, Trustee of the Robert M. Colasanto Revocable Trust, Plaintiff, Appellant,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendant, Appellee,

v.

Stephen A. FARLEY, Third–Party Defendant, Appellee.

No. 96–1152.

United States Court of Appeals, First Circuit.

Heard Sept. 12, 1996.

Decided Nov. 15, 1996.

Katherine A. Merolla, with whom Amedeo C. Merolla and Pucci, Goldin & Merolla, Providence, RI, were on brief, for appellant.

William B. VanLonkhuyzen, with whom Norman S. Zalkind and Zalkind, Rodriguez, Lunt & Duncan, Boston, MA, were on brief, for appellee Stephen A. Farley.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOYLE,* Senior District Judge.

SELYA, Circuit Judge.

This appeal summons our review of a jury verdict that awarded certain life insurance proceeds to the decedent's quondam companion rather than to a family trust. Upon close perscrutation of the record, the parties' briefs, and the applicable law, we discern no error.

## I. BACKGROUND

We start with a neutral account of the facts that were before the jury. The decedent, Robert M. Colasanto, made his mark as a successful business executive. In September of 1982, Colasanto met Stephen A. Farley. A relationship developed and the two men began cohabiting in San Diego, California. They lived initially in a rented dwelling and later in a luxurious home that Colasanto purchased. During this time frame Colasanto founded a health-care organization, Community Care Network, Inc. (CCN), which became hugely successful. Colasanto enjoyed the fruits of his good fortune including, inter alia, a beneficial interest under a group life insurance policy owned by CCN and is-sued by Life Insurance Company of North America (LINA) which afforded him a $140,-000 death benefit.

Colasanto's world changed in 1989 when a physician diagnosed him as HIV-positive. By 1992, he had contracted AIDS. Yearning for his native New England, he bought a home in Massachusetts. Colasanto and Farley took up residence there in the spring of 1993.

As Colasanto's health deteriorated, so, too, his relationship with Farley. The two men began discussing a property settlement in mid–1993. Despite the assistance of retained counsel, they were unable to agree on terms. According to Farley, however, the parties reached an informal agreement on or about December 3, 1993. Under that accord, Colasanto was to transfer ownership of five life insurance policies (including the LINA group life policy) to Farley.

On December 10, Colasanto completed and executed a form entitled "Application for Conversion of Group or Employee Life Insurance" (the conversion application) with the intention of converting his coverage under the group policy to an individual policy. Line 10(c) of the conversion application bears the inscription "Pay Death Benefit to," followed by three blank lines. Underneath the first blank line these instructions appear: "Print Full Name of Beneficiary and State Relationship." On the left-hand side of this line Colasanto typed "Stephen A. Farley." He left a blank space in the middle of the line and on the right-hand side he typed "Executor." [1] On the following two lines Colasanto added "Issue policy with Mr. Farley as owner. See enclosed letter." The letter, signed by Colasanto, bore a caption indicating that it was being transmitted "RE: CONVERSION OF GROUP COVERAGE TO INDIVIDUAL COVERAGE—SPECIFICATION OF OWNER OF INDIVIDUAL POLICY WHICH IS ISSUED." The body of the letter made explicit reference to the conversion application and stated in relevant part:

---

* Of the District of Rhode Island, sitting by designation.

1. The parties agree that on December 10, 1993, Colasanto's will nominated Farley as his execu-tor. Colasanto made a new will before he died. Farley was not named as executor then and was not appointed executor of Colasanto's estate upon Colasanto's demise.

Please note that I am requesting that the individual policy be issued such that the owner is as follows:

Stephen A. Farley
10448 Russel Road
La Mesa, CA 91941 D.O.B. 2–21–49

Mr. Farley is currently the beneficiary of the group coverage. If he needs to fill out another beneficiary form, please send it to him since that will be his right as the policy owner.

The premium statement(s) should be sent to Mr. Farley at the above address.

Colasanto transmitted the conversion application and letter to LINA. He sent forms and letters to four other life insurers on the same date. Each letter instructed the carrier to transfer ownership of the affected policy to Farley. In each of the five instances Colasanto contemporaneously furnished Farley with signed copies of the conversion application or assignment form, the cover letter, and a certified mail return receipt request in Colasanto's handwriting asking that the receipt be forwarded to Farley.[2]

Farley returned to California on December 22. On January 19, 1994, Colasanto sent a premium payment to LINA on the policy in question and accompanied it with a letter reiterating "that the individual policy should be issued to Stephen A. Farley as owner." Colasanto added: "If a separate form is required to change owner, then please send the form. Future premium statements should be sent to Mr. Farley as owner." LINA sent the individual policy to Colasanto in early February together with a letter admonishing that if Colasanto wished to designate Farley as owner, he should execute an assignment form and return it to LINA. Despite the fact that LINA enclosed a blank form with this letter, Colasanto never signed it.

Later that month, Farley returned to Massachusetts. A reconciliation ensued.[3] Colasanto returned to California with Farley,

only to return to Massachusetts alone following a bitter quarrel that took place on March 7, 1994. The next month Colasanto executed a change-of-beneficiary form in which he purported to designate one of his brothers, Valentino T. Colasanto, in his capacity as Trustee of the Robert M. Colasanto Revocable Trust, as the beneficiary of the LINA policy. Colasanto died on June 17, 1994.

Both Farley and the Trustee laid claim to the policy proceeds. The Trustee won the race to the courthouse steps and filed suit against LINA in a Rhode Island state court. LINA removed the case to federal district court, 28 U.S.C. § 1441, citing the existence of original jurisdiction arising out of both diversity and interpleader, *see* 28 U.S.C. §§ 1332(a), 1335, impleaded Farley, and deposited the face value of the policy ($140,000) into the registry of the district court. *See generally* Fed.R.Civ.P. 22 (discussing mechanics of interpleader actions).

LINA's departure from the fray left Farley and the Trustee locked in mortal combat. After considerable skirmishing, the case was tried and the jury returned a verdict in Farley's favor. The district court thereafter denied the Trustee's motions under Fed. R.Civ.P. 50(b) (judgment as a matter of law) and Fed.R.Civ.P. 59(a) (new trial). This appeal followed.

The Trustee presses several points in support of his position. We have considered them all, but address in this opinion only those contentions that have arguable merit and that are necessary to a resolution of this appeal.

## II. OWNERSHIP OF THE POLICY

██ The appellant's flagship claim is that no reasonable juror could conclude that Colasanto transferred ownership of the subject policy to Farley, and the lower court therefore should have granted the motion for

---

2. Upon Colasanto's death, Farley apparently collected the proceeds of the other four policies without incident. In any event, none of those policies are implicated here.

3. During this period Farley took possession of both the subject policy and the blank assignment form. The parties disagree about how this occurred. The appellant contends that Farley fil-

208

judgment as a matter of law.[4] The standard of review referable to a trial court's refusal to order judgment as a matter of law is set in cement. The court of appeals undertakes plenary review, see Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir.1994), and "examine[s] the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant," Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir.1987). In so doing the court "may not consider credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Id. Overriding a jury verdict is warranted only if the evidence "is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." Gibson, 37 F.3d at 735.

## A

The gist of the Trustee's argument is that Colasanto, although taking an initial step to transfer ownership of the policy to Farley, never effectuated that change according to the terms of the policy. Thus, no reasonable jury could find that Colasanto substantially complied with the explicit policy requirements necessary to anoint Farley as the owner.

This argument misses the mark. It is predicated on the common law doctrine of substantial compliance. The parties agree that the substantive law of Massachusetts governs this controversy, and, according to the appellant, the Massachusetts cases suggest that, if a policy specifies the manner in which transfers are to be made, the failure of literal compliance with the policy requirements will be excused only if the insured did everything that he could do to comply with those provisions. See, e.g., Acacia Mut. Life Ins. Co. v. Feinberg, 318 Mass. 246, 250, 61 N.E.2d 122, 124 (1945) (stating that "it is of the essence of substantial compliance that the insured must have done all in his power to effect the change, leaving only some minis-

terial act on the part of the insurer necessary to consummate it"); Resnek v. Mutual Life Ins. Co., 286 Mass. 305, 309, 190 N.E. 603, 604–05 (1934) (similar).

Building on this base, the appellant points to a provision in the LINA policy that states: "Changes [of ownership or beneficiary] must be requested in writing on a form satisfactory to us and sent to our Administrative Office." Because this condition could have been, but was not, met—after all, the carrier sent Colasanto a blank assignment form, and he easily could have completed it and mailed it back—the appellant insists that there was no substantial compliance, and, hence, that the attempted change of ownership was ineffectual. See id. at 309–10, 190 N.E. 603 (indicating that if the insured is put on notice that he has not done all in his power to comply with the requirements for changing a beneficiary, as by the insurer's rejection of an improperly completed form, and the insured does not take the suggested remedial action, there is no substantial compliance). Even though Colasanto explicitly designated Farley as owner on the conversion application, reaffirmed that designation in the cover letter, and wrote a subsequent epistle reiterating that Farley owned the policy, the appellant asseverates that Farley's claim of ownership fails because Colasanto never transmitted the assignment form to LINA. The appellant then tries to hoist this asseveration by its bootstraps, noting that LINA never recognized a transfer of policy ownership to Farley, instead sending the policy to Colasanto and accepting the change-of-beneficiary form that he subsequently submitted.

■ There are two visible flaws in the fabric of the appellant's thesis. In the first place, we do not think that the doctrine of substantial compliance applies to this case. It is generally held in Massachusetts that the provisions of an insurance policy which stipulate what formalities must attend an assignment are for the benefit of the insurer, not for the benefit of others. See Abbruzise v.

---

ched the papers; Farley claims that Colasanto gave them to him.

4. Transfer of ownership is a critical datum since, if Colasanto remained the owner of the policy on April 21, 1994, then his execution and delivery of

a change-of-beneficiary form on that date would have been effective, and the policy proceeds would be payable to the successor beneficiary (the Trustee).

*Sposata,* 306 Mass. 151, 153–54, 27 N.E.2d 722, 723–24 (1940); *Goldman v. Moses,* 287 Mass. 393, 397, 191 N.E. 873, 874 (1934). When, as now, the insurer is no longer a combatant, and the dispute over the validity of a transfer is limited to the assignor and the assignee (or those claiming under them), the assignor is precluded from relying mechanically on the formalities built into the policy to defeat the transfer. *See Abbruzise,* 306 Mass. at 153–54, 27 N.E.2d 722; *Goldman,* 287 Mass. at 397, 191 N.E. 873; *Herman v. Connecticut Mut. Life Ins. Co.,* 218 Mass. 181, 185, 105 N.E. 450, 451 (1914); *Merrill v. New Eng. Mut. Life Ins. Co.,* 103 Mass. 245, 252 (1869). In other words, the assignment, though not in compliance with the policy, nonetheless may be binding as between the assignor and assignee as long as the evidence of the act and the intent is sufficient to confirm the assignment's validity.

■ The second flaw in the appellant's thesis is that, even if the substantial compliance doctrine retains some relevance in a contest over life insurance proceeds between parties other than the insurer, an argument premised on substantial compliance in this case overlooks the obvious. If an insurance policy regulates the form of an assignment and the insured complies *literally* with those terms, the assignment is valid, and the question of substantial compliance is immaterial.

Here, the policy provides not one, but two, means of changing the ownership. It stipulates: "The Owner ('you,' 'your') is the Insured *unless otherwise designated in the application* or unless changed as provided under the Change of Ownership or Beneficiary provision [i.e., by use of an assignment form]." (Emphasis supplied). The jacket of the policy reiterates this duality: "The Owner ('you,' 'your') is the insured unless another person *is named in the application* or later becomes the Owner as allowed by the policy." (Emphasis supplied). Thus, while Colasanto could have effected the desired change of ownership by returning the assignment form to LINA as instructed, we see no reason why he could not also have done so *in the application.* Since the policy appears explicitly to have given the policy-holder that option, we think that a reasonable jury could have decided the point on the basis that Colasanto had chosen this manner of switching the policy's ownership and that the resultant designation was valid and binding.

■ A group policy and an individual policy that is spun off from it ordinarily are deemed a single, continuing contract of insurance. *See Binkley v. Manufacturers Life Ins. Co.,* 471 F.2d 889, 891 (10th Cir.), *cert. denied,* 414 U.S. 877, 94 S.Ct. 130, 38 L.Ed.2d 122 (1973); *Brindis v. Mutual Life Ins. Co.,* 29 Mass.App.Ct. 368, 369–70, 560 N.E.2d 722, 723 (1990). Until Colasanto retired, his employer owned the group policy. There was no individual policy (and, hence, no individual owner) until Colasanto exercised his right of conversion. In all probability, then, the conversion application is an application within the purview of the quoted policy language—we hesitate only because LINA is not a party here, and it cannot be heard on the topic in this proceeding—and in any event, the appellant concedes that it is such. He maintains, however, that the application could not be used to dictate ownership because there was no line or place on it to spell out the nature of the change.

■ We reject this argument. An insurance company cannot confer a prerogative upon the insured in the policy covenants and then surreptitiously take it away by omitting any reference to it on the forms that the company prints to implement the covenants. Here, the policy told Colasanto that he could designate the owner of a converted policy by naming that individual in the application, and he did so. At the very least, a reasonable jury, faced with this concatenation of circumstances, had a right to conclude that the policy allowed Colasanto to use the conversion application as a vehicle to bring about the ownership arrangement that he preferred. On that basis, the designation of ownership contained in the application complied literally with the terms of the policy.

**B**

■ The appellant advances a second theory that involves substantial compliance. He

asserts that, under Fed.R.Civ.P. 56(d),[5] the district court's order denying his pretrial motion for summary judgment precluded presentation of the substantial compliance issue at trial. The court's order stated:

*Although there does not appear to be any dispute that Robert M. Colasanto failed to execute and deliver the documents necessary to transfer ownership of the policy in question to Stephen Farley,* there is a genuine issue of fact regarding whether Robert Colasanto ever agreed to make Stephen Farley an irrevocable beneficiary and/or owner of such policy and whether adequate consideration was given for any such agreement.

(Emphasis supplied).

The appellant interprets the underscored language as establishing as a matter of law that Colasanto had not substantially complied with the requirements for transferring ownership of the policy to Farley.

The appellant's contention is vulnerable on several grounds. We mention two of them. First, the issue of substantial compliance is a red herring, as LINA is not challenging Farley's status and the case turns, in the final analysis, on Colasanto's discerned intent. *See supra* Part II(A). Second, the Rule 56(d) approach is little more than stultification by tactical semantics. We explain briefly.

■ Although the appellant is correct in noting that Rule 56(d) empowers a court to specify (and set to one side) facts that are without substantial controversy, the rule nevertheless "permits the court to retain full power to make one complete adjudication on all aspects of the case when the proper time arrives." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2737 (2d ed. 1983). Here, it is disingenuous to suggest that the court relinquished this power. Fairly read,

the underscored language simply acknowledges the lack of any dispute as to whether the assignment form was executed and delivered to LINA. To say, as the appellant would have it, that the statement decides the compliance question as a matter of law would require us both to torture the district court's words and overlook its manifest intention. We refuse to do so.

## III. THE BENEFICIARY DESIGNATION

■ The appellant's fallback position is that, even if Colasanto transferred ownership of the policy to Farley, it still must be found as a matter of law that Farley, as an individual, is not entitled to the policy proceeds. This reasoning rests on line 10(c) of the conversion application, which solicits the full name of the beneficiary and the beneficiary's relationship to the insured. In response Colasanto typed: "Stephen Farley Executor." The appellant posits that the use of the word "executor" in this context designates a fiduciary as the beneficiary and, therefore, Colasanto's executor—not Farley—is entitled to the avails of the policy.

The principal authority on which the appellant relies is *Faircloth v. Northwestern Nat'l Life Ins. Co.*, 799 F.Supp. 815 (S.D.Ohio 1992). In *Faircloth*, the insured wrote "Faircloth James H. Administrator" on the line in the application that asked for the name of the beneficiary. The court ruled as a matter of law that the policy proceeds went to the named beneficiary to be administered for the benefit of the estate, and not to him as an individual. *See id.* at 817. The appellant reads *Faircloth* to stand for the proposition that whenever a fiduciary label is found in close proximity to a beneficiary's name, the beneficiary designation must be construed as running to the actual fiduciary, not

5. The rule provides in pertinent part:
   If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts

are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy ... and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.
Fed.R.Civ.P. 56(d).

to the individual named. If *Faircloth* stands for this proposition—a matter on which we take no view—it contradicts basic tenets of Massachusetts contract interpretation, and we must therefore disregard it.

Massachusetts law holds that, if an ambiguity exists in contract documents, its ultimate resolution almost always turns on the parties' intent. *See Smart v. Gillette Co. Long–Term Disability Plan,* 70 F.3d 173, 178 (1st Cir.1995); *Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers,* 411 Mass. 39, 45, 577 N.E.2d 283, 288 (1991). In such a situation, the intent of the contracting parties is a matter to be discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available. *See Smart,* 70 F.3d at 178.

These rules apply to insurance documents in the same way as they apply in other contractual settings. *See Falmouth Nat'l Bank v. Ticor Title Ins. Co.,* 920 F.2d 1058, 1061 (1st Cir.1990) (applying Massachusetts law). For instance, two analogous Massachusetts cases indicate that, when the insured, called upon by the insurer to designate a beneficiary by name and relationship, complies by using a descriptive term such as "wife," it is up to the factfinder to determine whether the insured meant the particular person named, or, in the alternative, a person fitting the description on the date of the insured's death. *See, e.g., Strachan v. Prudential Ins. Co.,* 321 Mass. 507, 509, 73 N.E.2d 840, 843 (1947); *Brogi v. Brogi,* 211 Mass. 512, 514, 98 N.E. 573, 573 (1912).[6]

Of course, it can be argued that the appellation "executor" is more "legalistic" than the term "wife," and merits different treatment. We agree that the beneficiary's burden may be heavier when a fiduciary designation is in play, but, here, the end result is the same.

In general, courts construe beneficiary designations made in connection with insurance policies according to the rules applicable to the construction of wills. *See* 5 George J. Couch, Cyclopedia of Insurance

Law § 28:7 (2d ed. 1984). "The cardinal rule in the interpretation of a will is the ascertainment of the testator's intent from an examination of the language employed by him construed in the light of the circumstances known to him at the time he executed the will, and his intent, when determined, must be given effect unless contrary to some rule of law." *Magill v. Magill,* 317 Mass. 89, 92, 56 N.E.2d 892, 894 (1944). Thus, a testamentary gift will vest in a beneficiary *qua* fiduciary absent a plain manifestation of the testator's intent to accomplish a different result. *See Slavik v. Estate of Slavik,* 46 Ark.App. 74, 76, 880 S.W.2d 524, 526 (1994) (en banc); *Baker v. Wright,* 257 Ala. 697, 703, 60 So.2d 825, 830 (1952). However, merely inserting the word "executor" in a change of beneficiary form that requests the policyholder to state the relationship between the beneficiary and himself presents presumptively a materially weaker case for holding the gift to be taken in a fiduciary capacity than leaving property by will to a donee who is a fiduciary and is so described in the dispositive clause. *See Slavik,* 46 Ark.App. at 76, 880 S.W.2d 524. In sum, the naked fact that the beneficiary's relationship to the insured is designated in the policy documents by a legal term (e.g., "executor") does not compel a finding of a fiduciary disposition; the matter still comes down to a question of the declarant's intent.

Applying the principles gleaned from these cases, we descry no error here. It is plain as a pikestaff that Colasanto's use of the word "executor" in response to line 10(c) creates an ambiguity. Given the suggestive spacing that appears on the completed form and the delicate nature of Farley's relationship to Colasanto—a relationship that, in a homophobic society, he might wish to describe with some tact—the response can plausibly be construed as using the word in a purely descriptive sense. To be sure, it can be argued that Colasanto used the word to indicate the legal status of the beneficiary—but this possibility means no more than that the word, taken in context, is ambiguous. *See Fashion House, Inc. v. K mart Corp.,* 892

---

6. Interestingly, both cases determined that the named individual should take, though neither of them was legally married to the insured at the time of the latter's death. *See Strachan,* 321 Mass. at 511, 73 N.E.2d 840; *Brogi,* 211 Mass. at 514, 98 N.E. 573.

F.2d 1076, 1083 (1st Cir.1989) ("Contract language is usually considered ambiguous ... where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken."). Because such ambiguities must be resolved according to the insured's intent, it follows that the district court properly submitted this question to the jury.

■ Taking the next step, the jury's finding that Colasanto intended the term "executor" to describe Farley as an individual, not as a fiduciary, is amply supported. Since Farley was named as the executor of Colasanto's estate at the time Colasanto completed the conversion application, the description was accurate. Here, moreover, Colasanto originally had named Farley as the beneficiary of the group life policy. While it is true, as the appellant suggests, that a term such as "friend" or "companion" might have described Farley's relationship to Colasanto more fittingly, that is the stuff of jury arguments, not of appellate review—and the jury had a right to assess Colasanto's word choice with knowledge that emotionally charged phrases may have been painful to contemplate because a ten-year relationship was on the rocks. Finally, it is telling (or so the jurors could have thought) that Colasanto never once referred to Farley as a fiduciary or in a fiduciary status in subsequent correspondence or conversations anent the policy.

We need not paint the lily. On this scumbled record, a rational jury could have inferred—as this jury did—that the word "executor" was meant only to describe the particular individual whom the insured intended to name as the beneficiary of the policy, and not to portend a disposition to Farley *qua* fiduciary.

## IV. THE MOTION FOR A NEW TRIAL

■ The appellant tells us that the trial court erred in denying his motion for a new trial. Appellate review of orders refusing new trials is tightly circumscribed. We ordinarily will not disturb such a ruling if a reasonable basis exists for the jury's verdict. *See Wagenmann*, 829 F.2d at 200–01. Phrased another way, we will not intervene unless we ascertain that the outcome is "against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Putnam Resources v. Pateman*, 958 F.2d 448, 459 (1st Cir.1992). This is not such a case.

We need not tarry. The motion for a new trial hinged largely on the two issues previously discussed—the change of ownership and the identity of the beneficiary. We have already explained that the jury had enough evidence on these questions to support a verdict in Farley's favor. *See supra* Parts II(A) & III. We add here only that, on both issues, the totality of the evidence does not suggest either that justice miscarried or that the trial court's refusal to overturn the jury's verdict constituted an abuse of discretion. Consequently, the district court did not err in denying the appellant's new trial motion under Fed.R.Civ.P. 59(a). *See Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 717 (1st Cir.1994).

## V. THE EVIDENTIARY QUESTION

■ The appellant contends that the trial court blundered in refusing to admit into evidence portions of letters written by Colasanto to Farley on March 17, 1994 and April 1, 1994, respectively. As a starting point, the appellant claims that the proffered statements were admissible under Fed.R.Evid. 803(3). We do not agree.

■ Evidence Rule 803(3) removes from the hearsay prohibition statements that exhibit a declarant's "then-existing state of mind." But, this exception is not to be construed as a sweeping endorsement of all state-of-mind evidence. To be admissible under this exception, a declaration, among other things, must "mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time." 2 John W. Strong, McCormick on Evidence § 274 (4th ed. 1992). Because disputes over whether particular statements come within the state-of-mind exception are fact-sensitive, the trial court is in the best position to resolve them. As is true of other rulings admitting or excluding evidence, appellate review is solely for abuse of

discretion. *See, e.g., Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1158 (1st Cir.1996).

Here, the appellant argues that the proffered statements reflect Colasanto's intent, as early as February of 1994, not to transfer the converted policy to Farley, and that they therefore rebut Farley's claim that Colasanto had a donative intent. The district court excluded the correspondence on the ground that it did not relate to Colasanto's intent in February, but only to his intent at or about the time he wrote the letters. We detect no misuse of the court's wide discretion.

On Farley's version of the case, Colasanto evinced a donative intent vis-à-vis the LINA policy in December of 1993, in January 1994, and again in early February of that year. Between the last of these incidents and the first of the letters (which bore a date of March 17, 1994), a bitter fight between the long-time companions ensued. That imbroglio, for all practical purposes, eradicated any vestige of an amicable relationship. Although the subsequent letters clearly reflect Colasanto's animosity toward Farley on March 17 and thereafter, the significant intervening events—the quarrel and the ensuing breakup—could reasonably be thought to disrupt the contemporaneity required by Evidence Rule 803(3). Thus, we are unable to find that the district court abused its discretion by excluding the proffered state-of-mind evidence.

■■■ In a last-ditch effort to stem the tide, the appellant argues, in the alternative, that the evidence was proper under Fed. R.Evid. 804(b)(5). That catchall rule permits the introduction of hearsay evidence, not otherwise admissible, as long as the declarant is unavailable, the evidence possesses "circumstantial guarantees of trustworthiness," and the trial court finds that the evidence (i) is offered to prove a material facet, (ii) is more probative on the point than other available evidence, and (iii) the interests of justice will be served. *See* Fed.R.Evid. 804(b)(5); *see also United States v. Panzardi–Lespier,* 918 F.2d 313, 316 (1st Cir.1990). A trial court's determinations under Evidence Rule

804(b)(5) are reviewed under an abuse of discretion standard. *See Cook v. United States,* 904 F.2d 107, 111 (1st Cir.1990).

The preconditions for deployment of Rule 804(b)(5) are formidable, and the appellant cannot satisfy them in this instance. For example, the district court found that the statements lacked satisfactory assurances of trustworthiness. In light of the disputatious course of events that had been unfolding for months, leading to the retention of counsel by both Farley and Colasanto and then to the acrimonious quarrel in California, we cannot fault the district court's conclusion that the statements were suspect because litigation was in the wind when they were made.[7]

## VI. CONCLUSION

We need go no further. For aught that appears, the case was fairly tried and the lower court appropriately permitted the jury's verdict to stand.

*Affirmed.*

---

7. To emphasize the point, we note that the April 1 letter shows on its face that Colasanto contemporaneously sent a copy to his attorney.