# United States Court of Appeals
## For the First Circuit

No. 06-1355

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL RIVERA-HERNÁNDEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Circuit Judge,
Selya, Senior Circuit Judge,
and Tashima,[*] Senior Circuit Judge.

James R. Gaztambide, with whom Lizabel M. Negrón were on brief,
for appellant.
Nelson J. Pérez-Sosa, Assistant U.S. Attorney, Chief,
Appellate Division, with whom Rosa Emilia Rodríquez-Vélez, United
States Attorney, was on brief, for appellee.

August 3, 2007

---

[*] Of the Ninth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.   On May 12, 2003, Miguel Rivera-Hernández, the Puerto Rico Administrator for the Administración de Instituciones Juveniles ("AIJ") from 1993 until May 1999, was indicted on charges of extortion and money laundering.   A jury acquitted him of the extortion charge but convicted him of money laundering.   After the jury rendered its verdict, Rivera-Hernández moved to set it aside, arguing that the Government had not submitted sufficient evidence to support the money-laundering conviction.   The district court denied this motion.   On appeal, Rivera-Hernández attacks his conviction on several grounds.   After careful consideration, we affirm.

## I. Facts

We relay the facts in the light most favorable to the jury's verdict.   United States v. Castellini, 392 F.3d 35, 39 (1st Cir. 2004).

During Rivera-Hernández's tenure as Administrator, the AIJ published a Request for Proposal ("RFP") for a contract to build a juvenile penal institution in Puerto Rico.   Correctional Services Corporation ("CSC"), a Florida-based corporation specializing in the contract-bidding process, submitted its proposal for the project at a site in Salinas, Puerto Rico.   In November 1997, AIJ awarded CSC the project and on December 20, 1991, the parties entered into a contract to design, develop, and build a juvenile correctional facility in Salinas, Puerto Rico.

In the fall of 1997, Rivera-Hernández asked Henoc Dávila, a contractor, to recommend a subcontractor for the Salinas project. Dávila recommended José Cobián, a friend who owned a general contracting company. At Rivera-Hernández's request, Dávila contacted Cobián by telephone to schedule a lunch meeting for Rivera-Hernández, Dávila, and Cobián to discuss the project. Within two to three weeks, Rivera-Hernández, Cobián, and Dávila met at El Hipopótamo, a restaurant in Río Piedras.

According to Cobián, Rivera-Hernández arrived at the restaurant with an "air of power," escorted by two or three men. During the meeting, Rivera-Hernández explained that CSC was planning to build a prison in Salinas and that the company needed a contractor for the project. The Government introduced testimony that Rivera-Hernández indicated that the contract was not subject to the bidding process, and that when Cobián expressed interest in the job, Rivera-Hernández responded by saying, "Well, it's going to cost you." Having paid bribes in order to secure contracts in the past, Cobián testified that he understood this to mean that he would have to pay Rivera-Hernández money to secure the contract. He further testified that had he not paid Rivera-Hernández nearly $100,000, he would have been denied the opportunity to work on the Salinas project.

Although Cobián agreed to pay Rivera-Hernández, he explained that his business did not operate in cash. Cobián

testified that in response, Rivera-Hernández said, "Don't worry, I'll take care of that," and that at a later meeting, Rivera-Hernández asked Cobián to pay him $100,000 for the contract.

According to Cobián, Rivera-Hernández devised a scheme whereby payment would be made through Multi-Equipment Repairs & Services ("Multi-Equipment"), a company owned by Rivera-Hernández's father, Miguel Rivera-Díaz. Under the scheme, Multi-Equipment would submit fraudulent invoices to Ingenieros & Proyectistas, a company owned by Fernando Vigil, Cobián's friend. Because Vigil owed Cobián money, he agreed to pay the invoices to repay that debt.

The Government introduced evidence that Vigil made the payments without ever meeting Rivera-Hernández or his father, Rivera-Díaz, that Vigil never asked what the invoices were for, and that none of Vigil's equipment was ever repaired by Multi-Equipment. At trial, Rivera-Díaz admitted that his company never repaired equipment belonging to Ingenieros & Proyectistas and that he did not know Vigil. Rivera-Díaz also testified that he prepared fake invoices because his son asked him to prepare them.

Rivera-Hernández and Cobián met again several times to exchange fraudulent invoices for payments. During one of their meetings, Cobián gave Rivera-Hernández a check for $39,900 prepared by Vigil from Ingenieros & Proyectistas, dated December 26, 1997. That check was purportedly intended to cover two Multi-Equipment

invoices for equipment repair work, one dated August 21, 1997 for $18,995, and another dated September 2, 1997 for $20,995. The check was deposited in Multi-Equipment's bank account at RG Premier Bank. After this first payment, CSC and Cobián's construction company, Cobián, Agustín & Ramos, entered into a contract to build the Salinas juvenile institution.

In March 1998, three additional invoices totaling $59,820 were submitted to Ingenieros & Proyectistas, one for $25,795, another for $24,825, and the last for $9,200. As before, Ingenieros & Proyectistas issued a check for $59,820 to Multi-Equipment in payment for the fraudulent invoices. Combined with the first payment, the total amount paid by Cobián to Rivera-Hernández, through Vigil, was approximately $100,000. The Government introduced evidence that Rivera-Díaz, Rivera-Hernández's father, gradually transferred the monies to Rivera-Hernández, which were used to purchase a luxury vehicle, make a down payment on a new house, and make home improvements.

The Government also introduced evidence that Rivera-Hernández never reported any income from the near-$100,000 received from Cobián, or made mention of any business arrangements with Cobián in the 1997-98 financial report he was required to submit to the AIJ ethics committee. Rivera-Hernández also ignored a request by the ethics committee for more information about his finances,

including the provenance of the money he used for the down payment on his house.

All told, Cobián's company received three contracts with CSC, totaling approximately $9 million. After working on the Salinas project, Cobián worked on various remodeling projects in Bayamón, which he admitted to having obtained after bribing CSC's representative, Ramón Horta.[1]

On May 12, 2003, a grand jury returned a two-count indictment against Rivera-Hernández: Count One charged that Rivera-Hernández unlawfully obtained by extortion, under color of official right, approximately $100,000 from Cobián, in violation of the Hobbs Act, 18 U.S.C. § 1951; Count Two charged Rivera-Hernández with money laundering, in violation of 18 U.S.C. § 1957.

The case went to trial. After nearly two days of deliberations, the jury returned a not guilty verdict on the extortion count and a guilty verdict on the money-laundering count.

After the verdict was announced, Rivera-Hernández moved orally for judgment notwithstanding the verdict, arguing that the

_____

[1] Rivera-Hernández disputed the version of the facts ultimately accepted by the jury. He challenged Cobián's credibility, pointing to inconsistencies between Cobián's testimony in court and statements he made to the FBI. Furthermore, Rivera-Hernández emphasized that Cobián was facing criminal punishment for other bribery-related charges and thus had much to benefit from assisting the Government. Lastly, Rivera-Hernández objected to what he viewed as an erroneous decision by the district court that prevented the defense from exploring the relationship between Cobián and Horta.

jury's verdict was inconsistent.  The court requested the motion be made in writing, and on September 22, 2005, Rivera-Hernández filed a motion to set aside the jury's verdict on the money-laundering charge.  The Government filed an opposition to the motion on September 17, 2005, and on October 19, 2005, the district court denied Rivera-Hernández's motion.  On January 24, 2006, Rivera-Hernández was fined $25,000 and sentenced to a 37-month term of imprisonment, followed by a three-year term of supervised release.

## II. Discussion

Rivera-Hernández appeals his conviction on four grounds. First, he argues that the Government failed to present sufficient evidence to support the money-laundering conviction.  Second, Rivera-Hernández contends that the Government engaged in at least three instances of prosecutorial misconduct that prejudiced him at trial.  Third, he argues that the district court erroneously excluded testimony that would have justified his use of fraudulent invoices.  And finally, Rivera-Hernández argues that the district court erred in failing to instruct the jury on specific elements of money laundering for a second time.  We discuss each of these claims in turn.

### A. Sufficiency of the Evidence

Rivera-Hernández first challenges the sufficiency of the evidence supporting his conviction of money laundering.  "On challenges to sufficiency of the evidence, we take all the evidence

and inferences in the light most favorable to the verdict and ask whether a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." Castellini, 392 F.3d at 44 (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

To sustain the money-laundering conviction under 19 U.S.C. § 1957(a), the Government must show that Rivera-Hernández (1) knowingly engaged or attempted to engage in a monetary transaction (2) in criminally derived property (3) of a value greater than $10,000, and (4) derived from specified unlawful activity. However, "[i]n a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." Id. § 1957(c).

Rivera-Hernández argues that the Government failed to prove that the laundered money "derived from specified unlawful activity," in this case, extortion under the color of official right. Rivera-Hernández contends that the only evidence introduced in support of extortion was the "inconsistent[], inherent[ly] unrealiable[], and insufficien[t]" testimony of two cooperating witnesses. Appellant's Br. 19. Rivera-Hernández points out that the jury acquitted him of the extortion charge, and argues that although that acquittal does not automatically bar the money-laundering conviction, it serves as evidence that the Government

failed to prove that the laundered money "derived from specified unlawful activity" beyond a reasonable doubt.

The main problem with Rivera-Hernández's argument is that it does not actually test the sufficiency of the evidence the Government introduced in support of the extortion charge. Rivera-Hernández's first argument that the Government's evidence was insufficient because it was not credible is essentially irrelevant on appeal. In reviewing a sufficiency of the evidence claim, we view all of the evidence in the light most favorable to the Government. See Castellini, 392 F.3d at 44. Thus, as long as there was sufficient admissible evidence to support all of the elements of the crime charged, we will affirm the conviction.

The second argument Rivera-Hernández advances is equally unhelpful. This circuit has specifically upheld money-laundering convictions in cases where there is an actual acquittal of the underlying predicate offense. For example, in United States v. Richard, we noted that "the fact that the jury did not convict [the] defendant on the relevant underlying charges does not undermine the money-laundering convictions. The only relevant question when reconciling inconsistent verdicts is whether there was enough evidence presented to support the conviction." 234 F.3d 763, 768 (1st Cir. 2000) (quoting United States v. Whatley, 133 F.3d 601, 605-06 (8th Cir. 1998) (internal quotation marks and alterations omitted)); accord United States v. Acosta, 67 F.3d

334, 339 (1st Cir. 1995) ("A jury in a criminal case is not obliged to be consistent in its verdicts; on virtually the same evidence the jury may acquit on one count and convict on the other." (citing United States v. Powell, 469 U.S. 57, 65 (1984))).[2]

We think the Government introduced sufficient evidence to support the jury's conclusion that the laundered money was obtained through extortion. To establish extortion under color of official right under 18 U.S.C. § 1951, the Government must show that the defendant, a public official, has received a payment that he was not entitled to receive, with knowledge that the payment was tendered in exchange for some official act. Evans v. United States, 504 U.S. 255, 268 (1992); United States v. Cruzado-Laureano, 404 F.3d 470, 481 (1st Cir. 2005).

To that end, the Government presented testimony that Rivera-Hernández was the Administrator of the AIJ, a public office, at the time he received money from Cobián. With respect to the receipt of payment to which he was not entitled, the Government introduced testimonial and documentary evidence that Cobián paid Rivera-Hernández close to $100,000 to secure the contract with CSC through the exchange of fraudulent invoices for payment. Finally,

---

[2]   The First Circuit is not alone in upholding money-laundering convictions even though the defendant was not convicted of the underlying offense by which he obtained the money. See, e.g., United States v. De La Mata, 266 F.3d 1275, 1292 (11th Cir. 2001); United States v. Mankarious, 151 F.3d 694, 703 (7th Cir. 1998); Whatley, 133 F.3d at 605-06; United States v. Kennedy, 64 F.3d 1465, 1480 (10th Cir. 1995).

the Government introduced evidence that Rivera-Hernández knew that the payment was tendered in exchange for some official act in the form of testimony that Rivera-Hernández met with Cobián to discuss the subcontract for the Salinas project, and that in response to Cobián's interest in working on the project, Rivera-Hernández responded, "It's going to cost you." The Government also submitted evidence that based on Cobián's past experience working with public officials in Puerto Rico, the statement meant he would have to pay Rivera-Hernández to get the contract. Moreover, there was testimonial and documentary evidence that in an effort to cover up the payments, Rivera-Hernández devised a scheme to filter the funds though his father's company using fraudulent invoices, and that over the course of many months, Rivera-Díaz prepared false invoices on behalf of Multi-Equipment to be submitted to Ingenieros & Proyectistas at Rivera-Hernández's request. There was also evidence that Rivera-Hernández excluded the receipt of that money from the AIJ ethics report. Taken as a whole, this evidence suffices to support the jury's conclusion that Rivera-Hernández, a public official, received payments that he was not entitled to receive, with knowledge that the payment was tendered in exchange for some official act. See United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006) ("Since a plausible view of the evidence supports a finding that the appellant accepted the money . . . in exchange for official acts, the proposition that the government

failed to establish extortion under color of official right necessarily fails.").

B. **Prosecutorial Misconduct**

Rivera-Hernández also argues that the district court should have dismissed the case or granted a mistrial based on three instances of alleged prosecutorial misconduct: (1) the Government's comment on Rivera-Hernández's decision not to testify, (2) the Government's failure to provide the defense with statements by the cooperating witnesses, and (3) a prosecutor's meeting with Dávila and Cobián (both cooperating witnesses), in which she "actively participat[ed] in a suggestive, improper manner in the discussion[,] . . . 'refreshing' their testimony so they could 'correct' their conflicting version of the events as to Rivera-Hernández."

1. **Fifth Amendment Violation**

Rivera-Hernández first argues that the Government violated his rights under the Fifth Amendment by commenting on his option to testify in an objection to defense counsel's opening statement. We set forth the relevant exchange:

> DEFENSE COUNSEL: Now, who is my client, Miguel Rivera-Hernández, what will the evidence show about my client? My client was born and raised in Puerto Rico. He graduated from high school in Puerto Rico at the age of 16. From there he went to the university, graduated with a degree in political science at twenty years of age. From there, he went to obtain a Master's degree in Criminal

-12-

> Justice, and he obtained that at the age of
> 21.
>
> PROSECUTOR: Your Honor, may I object unless
> the defendant is going to testify?

Rivera-Hernández argues that the prosecutor's comment, "unless the defendant is going to testify," violated his Fifth Amendment right to remain silent because it called attention to the defendant's decision not to testify. We review de novo whether a prosecutor's comment violated the Fifth Amendment privilege against self-incrimination, United States v. Sullivan, 85 F.3d 743, 751 (1st Cir. 1996).

"A prosecutor's comment is improper where, under the circumstances of the case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Hardy, 37 F.3d 753, 757 (1st Cir. 1994) (internal quotation marks omitted). We find that the prosecutor's comment in this case did not violate Rivera-Hernández's right against self-incrimination under the Fifth Amendment mainly because we do not think the jury understood the objection to be a comment on Rivera-Hernández's failure to testify.

In United States v. Sullivan, 85 F.3d at 751, the defendant argued that a mistrial should have been granted after the prosecutor commented during his opening statement that the jury would "meet" the two defendants because the statement was an

-13-

improper comment on his right not to testify. On appeal, we held that the prosecutor did not violate the defendant's Fifth Amendment right against self-incrimination because, "[i]n context, the prosecutor's word choice did not 'naturally and necessarily' comment on the defendants' privilege against self-incrimination." Id. at 751.

Similarly in this case, we find that, in context, the prosecutor's comment, "unless the defendant is going to testify," did not violate Rivera-Hernández's Fifth Amendment right by impermissibly calling attention to his option not to testify. Given that it immediately followed an objection, it is clear that the statement was intended to qualify the objection, rather than to comment on the defendant's failure to testify. In fact, at the stage of the proceedings in which the comment was made -- opening statements -- the jury had no information as to whether Rivera-Hernández would testify. As such, we find that the comment was "at most a glancing brush rather than a blow against the privilege." United States v. Procopio, 88 F.3d 21, 30 (1st Cir. 1996).

### 2. Brady Violation

Rivera-Hernández further argues that the Government's delay in providing certain 302 forms -- forms routinely used by the FBI to memorialize interviews of potential witnesses -- and its refusal to provide other "requested discovery" violated his right

to due process.  See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the prosecution violates due process when it suppresses material evidence favorable to the accused); see also Giglio v. United States, 405 U.S. 150, 154 (1972) (concluding that the nondisclosure of certain impeachment information falls within the Brady rubric).  Rivera-Hernández contends that because the Government relied heavily on the testimony of cooperating witnesses, the lack of information about those witnesses impaired his ability to cross-examine them effectively.  We review the district court's determination of whether the Government failed to provide Brady material for abuse of discretion.  United States v. Perkins, 926 F.2d 1271, 1276 (1st Cir. 1991).

Brady requires the Government to disclose any exculpatory evidence which is "material either to guilt or to punishment." Brady, 373 U.S. at 87.  "Information is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Rosario-Peralta, 175 F.3d 48, 53 (1st Cir. 1999) (internal quotation marks omitted).  However, "[t]here is no general constitutional right to discovery in a criminal case, and Brady did not create one."  Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Instead, "to establish a violation of Brady, a defendant must provide the court with some indication that the [information] to which he . . . needs access contain[s] material

-15-

and potentially exculpatory evidence." United States v. Brandon, 17 F.3d 409, 456 (1st Cir. 1994). On appeal, Rivera-Hernández has made no attempt to describe the information he sought from the Government, much less explain its materiality or its potential to exculpate him.

Furthermore, Rivera-Hernández's argument fails because he has not established prejudice. When Brady or Giglio information surfaces belatedly, "the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect." United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990). Although Rivera-Hernández argues that his ability to mount an effective cross-examination was impaired, he does not show how his defense was impaired. See id. ("A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed."). As such, we find that Rivera-Hernández has failed to establish a Brady violation.

### 3. Improper Coaching

During Dávila's cross-examination, he testified that immediately after he appeared before the grand jury on April 15, 2003, he met with Assistant United States Attorney ("AUSA") Rebecca Kellogg to discuss his testimony. His attorney, FBI agent Brenda

Díaz, and Cobián were also present. At the meeting, they discussed the payments made by Cobián to Rivera-Hernández. Apparently Cobián said that he had given Rivera-Hernández a cash payment in an envelope at the restaurant El Hipopótamo. Dávila disagreed and told Cobián that he did not see him give Rivera-Hernández an envelope filled with cash at the restaurant. Cobián responded that he had given Rivera-Hernández $40,000 in cash in $20 bills, and Dávila pointed out that $40,000 in $20 bills is 2,000 bills, which would not fit in an envelope. Dávila testified that at that point, his lawyer said that if the money was given at the "El Hipopótamo," it had to have been given in Glad plastic bags. Then, AUSA Kellogg intervened and allegedly told Cobián and Dávila that they both had a "light memory" and that the money was paid by check. Dávila testified that she showed the checks to Cobián. After the meeting, Cobián testified before the grand jury that he never paid Rivera-Hernández in cash, only checks.

Rivera-Hernández argues that "[i]t was highly improper for the prosecutor to set up a meeting with two cooperating witnesses at the same time, in order to 'discuss' their testimony and 'refresh' their recollections so that conflicting statements would be avoided." Appellant's Br. 23.

It is unsurprising that Rivera-Hernández does not cite any case law in support of the argument that this meeting was so improper as to warrant a new trial. Prosecutors and defense

attorneys alike are entitled to prepare their witnesses. Moreover, the allegedly "coached" testimony, which related only to the form of payment (cash or check), is not central to the Government's case. Rivera-Hernández admits to having received the $100,000 and contests only what it paid for; his defense does not depend on Cobián's form of payment. As such, even assuming that the meeting between the AUSA and the cooperating witnesses was improper, it was not prejudicial because it did not "so poison[] the well as to have likely affected the trial's outcome." United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002) (internal quotation marks omitted).[3]

### C. **Hearsay Evidence**

Rivera-Hernández also attacks his conviction on the ground that the district court erred in excluding evidence justifying his use of the fraudulent invoices. He argues that the district court should have allowed his statement to Rivera-Díaz that "he was providing consulting services to [Cobián], but since he was still a public official and could not hold other employment, payment would be effected through Multi-Equipment." Appellant's Br. 23. At trial, the Government objected to that testimony, arguing that it was hearsay. The district court sustained the

---

[3] To the extent Rivera-Hernández is arguing that the prosecution should have notified the defense of inconsistencies it discovered in its witnesses' testimony, a mistrial is foreclosed by the fact that defense counsel learned about the meeting before Dávila or Cobián testified and cross-examined both about the meeting. See United States v. Pérez-Ruiz, 353 F.3d 1, 8 (1st Cir. 2003).

objection, finding that the testimony was offered to prove the truth of the matter asserted. After Rivera-Hernández moved for reconsideration, the district court again denied the request, finding that the statement did not qualify under any exception to the hearsay rule.

The Federal Rules of Evidence provide that an out-of-court statement offered to prove the truth of the matter asserted (commonly known as "hearsay") is inadmissible as evidence. See Fed. R. Evid. 801, 802. However, this rule is subject to a series of exceptions. Rivera-Hernández argues that the evidence should have been admitted under one of two exceptions: as a statement of then-existing state of mind, under Fed. R. Evid. 803(3), or as a co-conspirator's statement, under Fed. R. Evid. 801(d)(2)(E).

### 1. **State of Mind Exception**

Rule 803(3) authorizes the introduction into evidence of statements that concern "the declarant's then existing state of mind . . . such as intent, plan, motive, design, mental feeling . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

At trial, Rivera-Hernández sought to introduce the statement justifying his request for false invoices as an alternative explanation for his agreement with Cobián to exchange $100,000 for Rivera-Hernández's services. However, the district court excluded the evidence as hearsay, finding that the statement

did not qualify under the state-of-mind exception because the circumstances under which it was made were highly suspicious.

Because disputes over whether particular statements come within a state-of-mind exception are fact sensitive, see United States v. Cianci, 378 F.3d 71, 106 (1st Cir. 2004), "the trial court is in the best position to resolve them," Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 212 (1st Cir. 1996). We will therefore find error in the district court's exclusion of evidence only if the district court has abused its discretion. See United States v. Ventura-Meléndez, 275 F.3d 9, 13 (1st Cir. 2001).

To be admissible under the state-of-mind exception, "a declaration . . . must mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time." Colasanto, 100 F.3d at 212 (internal quotation marks and citations omitted); see also Horton v. Allen, 370 F.3d 75, 85 (1st Cir. 2004) ("The premise for admitting hearsay statements evidencing state-of-mind is that such statements are reliable because of their spontaneity and [the] resulting probable sincerity." (internal quotation marks and citations omitted (alteration in original))). Indeed, the advisory committee notes to Rule 803(3) require a "substantial contemporaneity of event and statement" when admitting an out-of-court statement under the state-of-mind exception. Fed. R. Evid. 803(1) advisory committee's

note (emphasis added); Fed. R. Evid. 803(3) advisory committee's note ("[Rule 803(3) is essentially a specialized application of [Rule 803(1)], presented separately to enhance its usefulness and accessibility."). This contemporaneity requirement is imposed to diminish the likelihood of fabrication or deliberate misrepresentation. See Fed. R. Evid. 803(1) advisory committee's note.

Given this contemporaneity requirement, we find that the district court did not abuse its discretion in holding that the state-of-mind exception did not apply to Rivera-Hernández's justification for his need of fraudulent invoices. In order to satisfy Rule 803(3), Rivera-Hernández's statement must have been made contemporaneously with his demand to Cobián for the $100,000, thereby mirroring Rivera-Hernández's state of mind at that time.[4]

---

[4] To the extent that Rivera-Hernández argues that the statement was made contemporaneously with the request for the invoices, we make two observations. First, there is no information in the record about the timing of the request for invoices relative to the statement justifying that request. See, e.g., United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir. 1985) (overruled on other grounds) ("Since, in proffering this testimony, [the defendant's] trial attorney did not advise the court how much time elapsed between the [discovery that he was under investigation] and the statements, the court was entitled to conclude that [the defendant] had sufficient time prior to the meeting with [the trial attorney] to concoct an explanation for his possession of [incriminating evidence]."). Second, and more importantly, Rivera-Hernández is seeking to introduce the statement to reflect his state of mind with respect to the demand for and receipt of Cobián's $100,000. As such, the relevant time by which to judge the admissibility of his statement is not when Rivera-Hernández requested the invoices, but rather when he agreed with Cobián to exchange services for money. See, e.g., Colasanto, 100 F.3d at 212-13 (excluding written

But evidence in the record confirms that Rivera-Hernández's statement to his father occurred well after his demand to Cobián for the money. As such, the district court could have reasonably concluded that the statement was untrusworthy, and therefore unreliable, because Rivera-Hernández had enough time to fabricate and misrepresent his statement. See United States v. Naiden, 424 F.3d 718, 721-23 (8th Cir. 2005) (excluding defendant's statement to a friend that he did not believe his online victim was really fourteen because the statement was made a day after the defendant met the victim and it was therefore "not made as an immediate reaction to his communication with her, but after he had had ample opportunity to reflect on the situation"); United States v. Macey, 8 F.3d 462, 467-68 (7th Cir. 1993) (excluding a statement justifying defendant's request for fraudulent invoices in part because "[t]he district court could have reasonably concluded that [the defendant] had time to fabricate a story in the four hours between his fraud and his statement to [the employee]"). Thus, the district court did not abuse its discretion in finding the state-

---

statements introduced to show the declarant's state of mind in February 1994 because "it did not relate to [the declarant's] intent in February, but only to [the declarant's] intent [in March and April 2004,] at or about the time he wrote the letters"); United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986) (excluding the defendants' statements denying any wrongdoing because they "had two years to reflect upon their actions and potentially an incentive to misrepresent the truth . . . . In addition, the defendants' statements . . . reflect only their lack of criminal intent in 1983, while the charges against them arose from actions several years earlier.").

-22-

of-mind exception inapplicable to Rivera-Hernández's statement to his father.

## 2. <u>Co-Conspirator Statement Exception</u>

Under Federal Rule of Evidence 801(d)(2)(E), "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

Rivera-Hernández claims that the district court should have admitted his statement under the co-conspirator statement exception to the hearsay rule because it was made by Rivera-Hernández's father, an alleged co-conspirator, in furtherance of the conspiracy of preparing false invoices. We review the district court's evidentiary rulings for abuse of discretion. <u>United States v. Lara</u>, 181 F.3d 183, 195 (1st Cir. 1999).

The alleged statement made by Rivera-Hernández is inadmissible under Rule 801(d)(2)(E), however, because it was not offered "against" his position at trial.[5] To the contrary, Rivera-

---

[5] Applying other sub-sections of Rule 801(d)(2), courts (including our own) have interpreted the requirement that a statement be offered "against a party" to mean that it must be introduced against that party's position at trial. <u>See</u>, <u>e.g.</u>, <u>United States v. Palow</u>, 777 F.2d 52, 56 (1st Cir. 1985) ("Rule 801(d)(2)(A) . . . requires that the admission at issue be contrary to a party's position at trial."); <u>Auto-Owners Ins. Co.</u> v. <u>Jensen</u>, 667 F.2d 714, 722 (8th Cir. 1981) ("An admission must be contrary to a party's position at trial."); <u>Butler</u> v. <u>S. Pac. Co.</u>, 431 F.2d 77, 80 (5th Cir. 1970) ("To be received in evidence an admission . . . must be contrary to that party's position at the time of the trial."). Because the requirement that the statement be made against the party precedes all of Rule 801(d)(2)'s sub-sections, we think it

Hernández's explanation for the request for fraudulent invoices was offered as a means to exculpate him.  As such, we find that the district court did not abuse its discretion in finding the co-conspirator statement exception inapplicable to Rivera-Hernández's statement to his father.

### D.  **Jury Instructions**

Mid-deliberation, the jury requested that the court repeat the instructions on the extortion and the money-laundering charges.  After meeting with all counsel, the court told the jury that it could read all of the instructions again.  The jury replied that they only wished to hear the requested instructions, not all of the instructions.  At that point, Rivera-Hernández asked the court to read the "specific intent" and the "knowingly, willfully and unlawfully" instructions along with the instructions on the extortion and money-laundering charges.  The district court denied this demand and read only the instructions the jury requested.

Although Rivera-Hernández acknowledges that the reading of post-charge instructions is left to the sound discretion of the trial judge, he argues that the jury's mid-deliberation request for the definition of both the extortion and money-laundering instructions demonstrates that the jury was confused as to the elements of the offenses.  Rivera-Hernández contends that the

---

logical to apply the same meaning to all sub-sections.  Thus, to qualify under the co-conspirator exception, a statement must be contrary to a party's position at trial.

-24-

court's refusal to read the instructions on "specific intent" and "knowingly, willfully and unlawfully" compounded this confusion, such that he is entitled to a new trial. However, given that the jury specifically stated that it only wanted instructions on the extortion and money-laundering charges, we find that the district court did not abuse its discretion in refusing to re-instruct the jury more broadly. See United States v. Ladd, 885 F.2d 954, 961 (1st Cir. 1989) ("The district court is not bound to submit to a party's wish list of charges to be ingeminated. Decisions of that sort are committed to the court's informed judgment and discretion." (internal quotation marks and citations omitted)).

## III. Conclusion

For the above-stated reasons, we affirm the district court's denial of Rivera-Hernández's motion to set aside the jury verdict.

**Affirmed**.