# United States Court of Appeals
## For the First Circuit

No. 08-1693

UNITED STATES,

Appellee,

v.

HARRY GUZMAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter, Associate Justice,* and Stahl, Circuit Judge.

James L. Sultan, with whom Jonathan Harwell and Rankin &
Sultan were on brief, for the appellant.
Sangita K. Rao, Attorney, Criminal Division, Appellate
Section, with whom Lanny A. Breuer, Assistant Attorney General,
Carmen M. Ortiz, United States Attorney, and Robert Richardson,
Assistant United States Attorney, were on brief, for the appellee.

May 3, 2010

*The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LYNCH**, **Chief Judge**.    Harry Guzman appeals from his January 2008 conviction under 18 U.S.C. § 844(i), and his life sentence for his role in an April 3, 2003, arson that killed a mother and her infant daughter.    As to trial error, Guzman primarily argues that the district court should have suppressed a November 2003 confession he made to Bureau of Alcohol, Tobacco, and Firearms ("ATF") agents, given that Guzman, when earlier arrested for a June 9, 2003, arson, had invoked his right to counsel and had been released on bail for that offense.    At the time of his November 2003 confession he was in state custody for violating his July bail conditions.    This claim requires us to apply the Supreme Court's recent decision in Maryland v. Shatzer, 130 S. Ct. 1213 (2010).

Guzman also raises claims regarding several of the court's evidentiary rulings, and whether the arson affected interstate commerce.    As to his life sentence, Guzman argues the district court failed to give an adequate explanation for the sentence at the sentencing hearing, as required by 18 U.S.C. § 3553(c), that the district court misapplied the sentencing guidelines, and that his sentence was substantively unreasonable. We affirm.

                                I.

We review the basic facts of the case.    Where there are disputes of fact, they are not material to the issues we decide.

-2-

There was also no clear error in the trial court's assessment of the facts for purposes of its rulings. Additional facts regarding Guzman's claims are developed as we discuss each claim.

The fatal fire took place around 3:00 a.m. on April 3, 2003, at a five-unit apartment building on Manchester Street, in Lawrence, Massachusetts. The building's owner lived in the building's first floor unit and rented out the remaining four units on the second and third floors. At least fifteen people lived in the building. The fire was started on the rear porch of the building and caused extensive damage. Matilda Medina and her two-month-old baby, Angelic Duran, who lived on the third floor, died as a result of the fire.

On the evening of April 3, 2003, Guzman was sleeping in his girlfriend's car outside her apartment, around the corner from Manchester Street. At some point in the evening, Juan Cruz arrived in the neighborhood. He approached Guzman, and the two agreed to burn the building. Accounts differ as to why they decided to light the fire at the building where Medina lived. By one account, the targeting of the building was motivated by a person living next door to the building having earlier sold Cruz bad drugs; since the drug dealer's building was built from bricks, Guzman and Cruz instead targeted Medina's building. By another account, it was the result of a fight Cruz had with a woman about unpaid drug money and was intended to "send a message."

Cruz and Guzman walked up a set of stairs behind the building and lit a fire on the building's second floor back porch, using a container of gasoline and a cloth. According to Guzman's November 2003 confession to an ATF agent that we discuss later, he supplied the gasoline and acted as the lookout. By other accounts, he was more actively involved and may have actually lit the fire.[1]

This April 3 fire was one of a series of arson fires that occurred in that neighborhood in the spring and summer of 2003. The last arson occurred on June 9, 2003. The same day, Guzman was arrested for the June 9 fire and taken to the police station. After a Massachusetts State Police officer read him his Miranda rights, Guzman invoked his right to counsel and was not questioned further. As Guzman was waiting in the police captain's office to be taken to his cell, State Trooper Matthew Gravini, whom Guzman already knew, arrived at the police station. After Guzman waved to Gravini, Gravini approached Guzman and asked how he was doing. Guzman expressed concern for himself and his family and then made

---

[1] In an interview with a state trooper just after the fatal fire, Guzman claimed that he was asleep as these events were transpiring and only became aware of the fire because of the sound of sirens from emergency responders. But two witnesses identified Guzman at the scene of the fire. A boy who was fourteen at the time of the offense testified that Guzman and Cruz asked him to be a lookout. He testified that Cruz and Guzman then disappeared behind the building for ten to fifteen seconds and later came running out, as smoke and eventually fire came out of the building. Another witness testified that he saw Guzman and the fourteen-year-old standing outside Guzman's girlfriend's building as the fire was burning and before emergency responders had arrived.

statements implicating Juan Cruz in the earlier, fatal April 3 fire. When Gravini indicated that he wanted to "take his statement in written form," Guzman once again invoked his right to counsel, and Gravini immediately ended the conversation.

Guzman was charged in state court for the June 9 arson and was released on bail in July 2003 until November 2003, when he was returned to state custody for violating bail conditions. He was held at the Essex County Correctional Facility in Middleton, Massachusetts.

On November 12, 2003, two ATF agents traveled to the facility to interview Guzman about the April 3 arson. Pursuant to facility policy, the deputy superintendent of the facility asked Guzman if he would be willing to speak with the agents, and Guzman agreed and signed a form consenting to the interview. Guzman met the two agents in a large conference room. At the outset of the meeting, the agents advised Guzman of his Miranda rights, and Guzman signed the top half of a form acknowledging that he had been advised of his rights. The bottom half of the form, containing a waiver of Miranda rights, remained unsigned at this time. Guzman was also told by the agents several times that he could leave the meeting at any time.

The ATF agents told Guzman that they were there to speak about the April 3 fire. For the next hour of conversation, the agents told Guzman that he had been implicated in the crime and

that there was a difference between an intentional killing and an accident. After listening to the agents for about an hour, Guzman responded, saying that the April 3 fire had been "bothering him." He gave his version of the events and admitted that he had helped Cruz commit the arson by providing fuel and acting as a lookout. After Guzman had told his story, the ATF agents asked Guzman to provide a written or recorded version of his statement. Guzman said that he would do so only with his lawyer present. The agents ceased questioning him but asked Guzman to sign the bottom half of the Miranda waiver form, indicating that he had waived his rights and agreed to talk with them. Guzman signed the waiver at approximately 1:15 p.m., but, at the agents' request, Guzman indicated on the form that he had waived his rights at 12:15 p.m., when he began telling his version of events to the officers.

## II.

On September 8, 2004, a grand jury in the District of Massachusetts returned a two-count superseding indictment charging Guzman with arson of two separate buildings used in any way affecting interstate commerce, in violation of 18 U.S.C. § 844(i), for the April 3 and June 9 fires. The district court later severed the two counts to proceed in separate trials, and this case concerns only the trial on Count One, the fatal April 3 fire.

Before trial, Guzman moved to suppress his June 9 statements to Trooper Gravini and his November 12 statements to the

ATF agents, on grounds that they were elicited from him by the officers after he had invoked his right to counsel. After a hearing, the district court granted the motion to suppress as to the June 9 statement but denied suppression of Guzman's November 12 admissions to the ATF agents. Those admissions were introduced at trial through the testimony of the two ATF agents. Neither Guzman nor Juan Cruz testified at trial.

Guzman also moved for dismissal before trial on the ground that the arson did not affect interstate commerce. The district court denied this motion.

The seven-day jury trial began on January 15, 2008. A government witness at trial was Guzman's former cellmate, Juan Ramos. Ramos testified that Guzman had confessed his involvement in the arson to Ramos; Ramos also testified to Guzman's description of the crime. Guzman's attorney elicited from Ramos that Ramos had alternate sources for this information: Ramos knew Guzman was keeping discovery documents in their shared cell, and Guzman had told Ramos about his conversations with Guzman's attorney. On the government's objection, however, the court did not allow Guzman's trial counsel to elicit from Ramos the contents of the discovery documents. Guzman objected in writing to the court's limiting of his cross-examination. The court rejected his argument.

The government also made a motion in limine to prevent admission of two hearsay statements by Cruz that Guzman claimed

were statements against penal interest, which implicated Cruz in the fire and showed Cruz acted alone. The district court granted the government's motion without explanation in a ruling from the bench.

On January 24, 2008, the jury found Guzman guilty. Guzman already had four earlier convictions, including several charges of disorderly conduct, and two instances of resisting arrest, which, according to the presentence report ("PSR"), qualified him as a career offender. At the end of the May 13, 2008, sentencing hearing the district court sentenced Guzman to life in prison, three years' supervised release, payment of restitution in the amount of $380,695, and a $100 special assessment. The court did not explain its reasons for the life sentence at the hearing. In a written statement of reasons, filed June 2, 2008, the district court indicated that it adopted the PSR without change and within the sentencing guideline range, noting that it "imposed the sentence after considering all the surrounding circumstances and the probation department's determination as to the advisory guideline range."

III.

A. <u>There Was No Error in the Denial of the Motion to Suppress</u>

Guzman claims error in the district court's failure to suppress his November 12, 2003, statements. "We review the district court's findings of facts for clear error and its

application of the law to those facts de novo." United States v. Dunbar, 553 F.3d 48, 55 (1st Cir. 2009).

Guzman argues that the district court erred in denying his motion to suppress for two reasons. First, he argues that the November 12 statements were made during a custodial interrogation and that because he had invoked his right to counsel five months earlier to the state police following his June 9 arrest, the ATF agent's questioning of him violated the rule of Edwards v. Arizona, 451 U.S. 477 (1981). Second, Guzman insists that, under the circumstances of his meeting with the ATF agents, he did not validly waive his Miranda rights.

1.      Shatzer Forecloses Defendant's Argument Based on Edwards

In his original briefing for this case and at oral argument, Guzman argued that he was in the ATF agents' custody at the time that he gave the November 12 statement, and that, as a result, his June 9 invocation of his right to counsel barred the ATF agents from initiating further interrogation, even though he was released on bail for a period of about four months between the time of the first and second interrogations. See Minnick v. Mississippi, 498 U.S. 146, 153 (1990); Arizona v. Roberson, 486 U.S. 675, 682-83 (1988); Edwards, 451 U.S. at 484. Because of the very recent Supreme Court decision in Shatzer, Guzman's argument fails. Even assuming arguendo that the November 12 meeting between

Guzman and the agents was a "custodial interrogation," <u>Shatzer</u> forecloses the claim.

In <u>Shatzer</u>, the Supreme Court established a bright-line rule that if a suspect who has invoked his right to have counsel present during a custodial interrogation is released from police custody for a period of fourteen days before being questioned again in custody, then the <u>Edwards</u> presumption of involuntariness will not apply.  130 S. Ct. at 1223.  The Court stressed that the <u>Edwards</u> rule was a non-constitutional, judicially-crafted rule, which could be "justified only by reference to its prophylactic purpose."  <u>Id.</u> at 1220.  In reaching this decision, the Court noted its concern that a suspect, held in uninterrupted custody in an unfamiliar, police-dominated atmosphere, might be "coerced or badgered" into abandoning his earlier invocation of the right to counsel.  <u>Id.</u> at 1220.  In contrast to that situation, the Supreme Court noted that "[w]hen . . . a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced."  <u>Id.</u> at 1221.  Under those circumstances, the suspect's decision to speak to officers is not likely to be attributed to badgering but to the suspect coming to believe that cooperation is in his best interest.  <u>Id.</u>

In this case, Guzman was released on bail for about four months between the time that he originally invoked his right to counsel and the ATF agents' subsequent attempt to question him. This far exceeds the time period required by Shatzer and thus its break-in-custody exception to Edwards applies.

After Shatzer was decided, we obtained supplemental briefing from the parties. Guzman acknowledged in his supplemental brief that a break-in-custody exception to Edwards exists, but argued that even after Shatzer the Edwards rule should nonetheless apply because his Miranda rights were not scrupulously honored in the first instance when Trooper Gravini questioned him on June 9. He cites no authority in support of such a contention and we conclude that, after having been released for four months, Guzman cannot contend that his prior invocation of his Miranda rights applied.

2.　　　The Court Did Not Err in Finding There Was a Valid Waiver

That leaves Guzman's argument that the trial court erred in holding that he validly waived his Miranda rights during the November discussions with the ATF. "A defendant may waive his Miranda rights if the waiver is made voluntarily, knowingly, and intelligently." United States v. Palmer, 203 F.3d 55, 60 (1st Cir 2000). An express waiver is not required. United States v. Mejia, No. 08-2505, 2010 WL 850184, at 3 (1st Cir. Mar. 12, 2010); see also North Carolina v. Butler, 441 U.S. 369, 373 (1979). "We

-11-

review the determination of whether a waiver of rights was voluntary de novo." United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004).

Here, the trial judge supportably found that Guzman's waiver was voluntary. The court was presented evidence that Guzman consented in writing to speak with the ATF agents before the meeting even began. The ATF agents explained to Guzman his Miranda rights and Guzman signed a form indicating that he understood them. It is true that he did not sign the portion of the form waiving his Miranda rights at the time; apparently he was not asked to do so. Nonetheless, as counsel for Guzman admitted before this court at oral argument, Guzman verbally agreed to speak with the agents about the events of April 3 without a lawyer present. At the close of the interview Guzman signed a form indicating he had waived his right to remain silent. Oral waivers of Miranda rights are sufficient, and individuals may properly invoke their right to counsel before making written statements while still waiving their Miranda rights with respect to oral statements. See Connecticut v. Barrett, 479 U.S. 523, 529 (1987).

The district court rejected counsel's reliance on language from Missouri v. Seibert, 542 U.S. 600 (2004), that failure to give warnings and obtain a waiver before initiation of custodial questioning generally requires exclusion of any statement obtained. The court distinguished Seibert and found that the ATF

-12-

agents had told Guzman he could leave if he did not want to talk and had shown him the door was unlocked. That the agents spoke with Guzman for approximately an hour before he agreed to tell his side of the story does not mean his decision to speak was coerced or involuntary.

Guzman argues that the ATF agents misled him by presenting him with the waiver form and by not asking him to sign the waiver form until the end of the interview. He couples that with the argument that the ATF agents knew from Guzman's June 9 conversation with Trooper Gravini that Guzman drew a distinction between what he said and written statements, and that Guzman was spooked by requests to write things. That may be true, but Guzman was told his rights and he confirmed that he understood them. See United States v. Van Dusen, 431 F.2d 1278, 1281 (1st Cir. 1970). That the agents chose certain conversational tactics after giving the warning does not make Guzman's choice to talk a coerced choice.[2]

---

[2] What is more troubling from the standpoint of the administration of justice was the back-timing of the waiver of rights. The fact of the back-timing was presented to the court, so its use was not an attempt to mislead the court. Nor does the back-timing support any argument that Guzman's waiver was invalid; it occurred after Guzman decided to speak with the agents.

-13-

B.    There Was No Error in the Court's Exclusion of Hearsay Statements Offered by Guzman and Limits on Cross Examination

Guzman next argues that the district court erred in granting the government's motions in limine excluding two separate hearsay statements by Cruz, and in preventing Guzman from further cross-examining the government's witness, Ramos, on whether he actually learned from discovery documents that Guzman had obtained from his lawyer the information he attributed to an admission from Guzman.  We review a district court's exclusion of evidence for abuse of discretion.  United States v. Rivera-Hernandez, 497 F.3d 71, 81 (1st Cir. 2007).  The district court did not abuse its discretion for the reasons that follow.

1.    The Exclusion of Cruz's Hearsay Statements Was Not Prejudicial Error

Guzman argues that the hearsay statements should have been admitted as statements against penal interest under Fed. R. Evid. 804(b)(3).  The district court excluded the statements, without explanation, after receiving written motions from both parties and hearing brief arguments.  Counsel for Guzman did not at the time request an explanation for the court's rulings.

First, Guzman sought to admit a portion of a recorded conversation between Cruz and a confidential informant.  The conversation occurred just after Cruz and the informant drove past the site of the fatal April 3 fire.  The informant asked Cruz whether he committed the arson, and Cruz responded, "I didn't have

-14-

anything to do with that."  Moments later, in response to another question by the informant, Cruz stated that "[t]hey wanted me to do it but I didn't do it because you know two people died there." Cruz also told the informant "[t]his nigar that did it, he didn't even get paid for it."

When the declarant is not available, a statement may nonetheless be admitted if,

> at the time of its making [it] . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Id.

The district court did not abuse its discretion in granting the government's motion in limine on these statements, based on the arguments the parties put forth in their motions.  The government argued to the court that the statements were not against Cruz's penal interest; Cruz denied involvement in the fire.  Guzman argued that Cruz's statements in this exchange were against penal interest because they showed that someone wanted him to set the fire and that he knew that whoever did set the fire did not get paid for it.  But those statements were not inculpatory and not against Cruz's penal interests.

Second, Guzman also sought to admit statements from a conversation that a witness, Javier Rodriguez, overheard between Cruz and a third person. A couple weeks after the fatal fire, a state trooper walked into a local park to hand out flyers offering a reward for information about the fire. About five minutes after the trooper left the park, Rodriguez claimed he overheard Cruz say to the third person, "now that the people know it's me, they are going to rat me out." Cruz later said to this third person in Spanish, "I just told you that I started the fire, how do I know that you 'niggers' won't rat me out."

The government introduced evidence from the third person Cruz was speaking to that this was a joking conversation in its motion in limine. It argued that because this person viewed the conversation as a joke, there was no corroboration.

Cruz's purported statement was plainly against penal interest. Contrary to the government's argument, the statement of this third person tended to corroborate Rodriguez's statement about what Cruz had said. The fact that the third person described the conversation as joking was not an adequate reason to exclude the statement. The prosecution could have argued that to the jury.

Still, if there was any error, it was harmless. See United States v. Morales-Machuca, 546 F.3d 13, 22 (1st Cir. 2008). There was a great deal of other evidence that Cruz participated in the arson. And, contrary to Guzman's argument, the statement says

-16-

nothing about Guzman and is not a statement by Cruz that he acted alone.

2.         The District Court Did Not Err in Limiting the Cross-Examination of Ramos

Guzman also claims the district court improperly limited his cross-examination of Ramos, Guzman's former cellmate, by not allowing him to keep questioning to elicit from Ramos the specific contents of the discovery documents provided to Guzman. Guzman had ample opportunity to establish from Ramos that he may have learned the details of the offense from discovery documents,[3] and so Ramos's testimony about Guzman's supposed confession was false. The district court did not abuse its discretion in not allowing Guzman to introduce hearsay statements about the contents of those documents and Guzman's communications with his lawyers. See Fed. R. Evid. 403, 802. This was exactly the sort of balancing committed to the discretion of trial judges.

Guzman elicited from Ramos that Guzman, after meeting with his lawyers, told Ramos that an argument had occurred between Cruz and one of the victims the day before the fire and that there

---

[3]     Defense counsel was permitted to establish that Ramos had previously testified against cellmates; that Ramos was aware of what discovery materials are; that Ramos was aware Guzman was meeting with his lawyers, receiving paperwork from them and leaving that paperwork in his cell; that Guzman spoke with Ramos about what he learned from his lawyers; and that there were weekly times when Ramos would be in the cell alone and therefore would have access to Guzman's discovery materials. At closing arguments defense counsel asserted that every detail Ramos testified to was obtainable through Guzman's discovery documents or conversations with Guzman.

was a discovery report to that effect.  The district court did not abuse its discretion, as Guzman contends, in not permitting him to elicit from Ramos what Guzman said his lawyers had told him about the conversation; it was hearsay.  The remaining arguments are without merit.

3.        Guzman Was Not Denied His Right to Present a Defense

There is also no credible claim that these rulings denied Guzman his right to present a defense.  "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."  United States v. Scheffer, 523 U.S. 303, 308 (1998).

C.        The District Court Correctly Found a Jurisdictional Nexus
          with Interstate Commerce

Guzman argues that the district court erred in finding that the Manchester Street building was "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" as required by the arson statute, 18 U.S.C. § 844(i).  It is agreed that the building had five units, four of which were rented out and one of which was occupied by the building's owners.

The rule in this circuit is "that rental property is per se sufficiently connected to interstate commerce to confer federal jurisdiction under Section 844(i)."  United States v. DiSanto, 86 F.3d 1238, 1248 (1st Cir. 1996); see also United States v. Ruiz, 105 F.3d 1492, 1499 (1st Cir. 1997).  Guzman argues that the Supreme Court's decision in Jones v. United States, 529 U.S. 848

(2000), calls this holding into question. <u>Jones</u> held that an owner occupied private home was not used in interstate commerce for purposes of § 844(i). <u>Id.</u> at 859. Guzman argues that a building that is partially owner occupied and partially rented, as here, should not be considered a part of interstate commerce.

<u>Jones</u> does not help Guzman. In <u>Jones</u> the Supreme Court explicitly affirmed an earlier case, <u>Russell</u> v. <u>United States</u>, 471 U.S. 858 (1985), where the Supreme Court had found a two-unit rental building to be used in interstate commerce. <u>Jones</u>, 120 U.S. at 856. The <u>Jones</u> Court emphasized the proper inquiry under § 844(i) is how the property is used and whether that use affects interstate commerce. <u>Id.</u> at 854. There is no question that the building where the fatal fire occurred in this case was used as a rental property, which makes it sufficiently connected to interstate commerce for purposes of § 844(i).

D.      <u>Guzman Was Properly Sentenced</u>

Guzman makes three arguments attacking the imposition of a life sentence: (1) that the district court violated 18 U.S.C. § 3553(c) in failing to provide an oral explanation for his sentence; (2) that the district court erred in applying the first-degree murder guideline in calculating his total offense level; and (3) that his life sentence was substantively unreasonable. While troubled by the district court's failure to explain at the

-19-

sentencing why Guzman would serve a life sentence, we affirm under the applicable plain error standard.

1.            The District Court's Failure to Explain the Sentence Was Not Plain Error

Guzman failed at sentencing to object to the district court's lack of explanation as required by 18 U.S.C. § 3553(c). We review unpreserved claims that the district court failed to comply with § 3553(c) for plain error. United States v. Pakala, 568 F.3d 47, 56 (1st Cir. 2009). This is not a situation at sentencing in which defendant had no opportunity to bring to the court's attention its omission.

"To vacate a sentence under plain error review, four prerequisites must be established: (1) an error occurred; (2) the error was clear and obvious; (3) the error affected the defendant's substantial rights; and (4) the error impaired the fairness, integrity, or public reputation of the judicial proceedings."[4] United States v. Mangual-Garcia, 505 F.3d 1, 15 (1st Cir. 2007).

Section 3553(c) requires that a district court "at the time of sentencing . . . state in open court the reasons for its

---

[4]    Guzman cites a number of cases from other circuits in support of lowering the plain error standard where the sentence is not explained, but those cases are all distinguishable from this case because they all involved sentences that were above the guidelines range, which the judge failed to explain as required by § 3553(c)(2). See, e.g., United States v. Blackie, 548 F.3d 395, 400-02 (6th Cir. 2008); In re Sealed Case, 527 F.3d 188, 191-93 (D.C. Cir. 2008); United States v. Lewis, 424 F.3d 239, 245-49 (2d Cir. 2005).

-20-

imposition of the particular sentence."[5]  Here, the district court, after hearing argument and allocution, merely stated "Okay.  I am going to sentence you to life."  This circuit has held that failure to provide an adequate explanation is not per se plain error.  Manqual-Garcia, 505 F.3d at 16.  We have "recognized that '[e]ven silence is not necessarily fatal; a court's reasoning can often be inferred by comparing what was argued by the parties or contained in the presentence report with what the judge did.'"  United States v. Arango, 508 F.3d 34, 46 (1st Cir. 2007) (quoting United States v. Turbides-Leonardo, 468 F.3d 34, 40-41 (1st Cir. 2006)) (alteration in original).

Guzman argues a substantial right was harmed because the lack of explanation denied him an adequate record from which to appeal the sentence.  Not so.  There is a lengthy sentencing record.  This includes the parties' written sentencing memos and oral arguments at the sentencing hearing.  The government in these arguments adopted the PSR and made clear its reasons why a life sentence should be imposed.  Guzman argued against a life sentence and made the case for a shorter sentence.  The sentencing record also includes the PSR, the district court's statements at the sentencing hearing, and the district court's later statement of

---

[5]    There is no argument that the guideline range in this case exceeded twenty-four months or that the court sentenced Guzman above his guideline range; thus § 3553(c)(1) and (2) do not come into play here.

reasons, which adopted the PSR. Although the district court's failure to explain the sentence was inadequate, it was not plain error.

2.      The District Court Correctly Applied the Sentencing Guidelines

"We review the district court's interpretation of the Guidelines de novo and its factual findings for clear error." United States v. Rivera-Rivera, 555 F.3d 277, 292 (1st Cir. 2009).

Violations of 18 U.S.C. § 844(i) are sentenced under § 2K1.4. That section specifically instructs that "[i]f death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A." U.S.S.G. § 2K1.4(c)(1). Guzman argues that the district court erred in finding that the analogous provision from Chapter Two was the provision for first degree murder, § 2A1.1, because Guzman did not premeditate or intend to kill the two victims, and so he should have been sentenced under the provision for second degree murder, § 2A1.2. In the alternative, he argues that the cross reference in § 2K1.4(c) is ambiguous and, under the rule of lenity, he should be sentenced under the second degree murder provision.

There was no error. The analogous provision, as required by § 2K1.4(c), is clearly § 2A1.1, under both the text of the Guideline and our precedent. Section 2A1.1 covers sentencing for first-degree murder under 18 U.S.C. § 1111. That provision

-22-

includes deaths caused by arson in its definition of first degree murder. Moreover, the commentary for § 2A1.1 explains that it applies not only in cases of premeditated killing, but also "when death results from the commission of certain felonies." U.S.S.G. § 2A1.1, cmt. n.1; see also United States v. Shea, 211 F.3d 658, 674 (1st Cir. 2000); United States v. Serrano-Osorio, 191 F.3d 12, 15 (1st Cir. 1999). Other circuits agree that § 2A1.1 is the appropriate provision when arson results in death. See, e.g., United States v. Tocco, 135 F.3d 116, 130-31 (2d Cir. 1998); United States v. El-Zoubi, 993 F.2d 442, 449 (5th Cir. 1993).

Guzman also argues that even if he was properly sentenced under § 2A1.1, the district court should have considered a downward departure because the deaths were not caused knowingly or intentionally. See U.S.S.G. § 2A1.1, cmt. n.2(b).

We adhere to a general rule that "a sentencing court's discretionary refusal to depart is unreviewable." United States v. Sanchez, 354 F.3d 70, 76 (1st Cir. 2004). Guzman claims to be within an exception to this rule, arguing that the district court erroneously believed it lacked authority to downwardly depart, see id., as shown by its statement that Guzman was "chargeable with having intended the predictable consequences of his actions." This was not a statement the court believed it lacked authority. Further, "sentencing courts are under no obligation to make

-23-

specific findings when <u>denying</u> departure requests." <u>Id.</u> (emphasis in original).

We reject Guzman's contention that the district court's factfinding to determine § 2A1.1 to be the proper guideline violated the rule of <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466, 490 (2000). "A sentencing court may make factual findings that result in an increase to a defendant's sentence as long as the sentence imposed is within the default statutory maximum." <u>United States</u> v. <u>Vasco</u>, 564 F.3d 12, 23 (1st Cir. 2009). Here, the jury convicted Guzman of arson resulting in death, and 18 U.S.C. § 844(i) states that the maximum sentence under such circumstances may be life imprisonment or the death penalty. This claim clearly fails.

3.        <u>Guzman's Life Sentence Was Substantively Reasonable</u>

Finally, under an abuse of discretion standard, <u>Morales-Machuca</u>, 546 F.3d at 25, we reject Guzman's argument that his life sentence was substantively unreasonable. Guzman was sentenced within the Sentencing Guidelines range for an arson of a dwelling that resulted in the deaths of two people, a mother and her child. The arson was in a building with five units, housing fifteen people. At 3:00 a.m. it was likely the residents were in bed, asleep in their units. It was predictable someone would be hurt or killed.

The judgment of the district court is <u>affirmed</u>.